661 F.2d 979
 8 Bankr.Ct.Dec. 297
 Herbert RUBIN, as Trustee of U.S.N. Co., Inc., Bankrupt, and
Eliot H. Lumbard, as Trustee of Universal Money
Order Co., Bankrupt, Plaintiffs-Appellants,
v.
MANUFACTURERS HANOVER TRUST CO., Defendant-Appellee,
and
John M. Trent and Eugene Skowron, Defendants.
 No. 344, Docket 80-7468.
 United States Court of Appeals,
Second Circuit.
 Argued March 11, 1981.
Decided Sept. 21, 1981.
Order Filed Oct. 1, 1981.
 
 Terry Myers, New York City (Morrell I. Berkowitz, Herzfeld & Rubin, P.C., New York City, on the brief), for plaintiffs-appellants.
 Rolon W. Reed, New York City (John F. Cambria, Don D. Grubman, Simpson Thacher & Bartlett, New York City, on the brief), for defendant-appellee.
 Before FRIENDLY, MANSFIELD and KEARSE, Circuit Judges.
 KEARSE, Circuit Judge:
 
 
 1
 This appeal arises from the collapse and ultimate bankruptcy of two affiliated firms, U.S.N., Inc. ("USN"), and Universal Money Order Co., Inc. ("UMO"), companies in the business of issuing money orders. Plaintiffs Herbert Rubin and Eliot H. Lumbard, bankruptcy trustees of USN and UMO, respectively, appeal from a judgment of the United States District Court for the Southern District of New York, 4 B.R. 447, Milton Pollack, Judge, dismissing their claims to recover the value of certain funds and securities of the bankrupts from defendant Manufacturers Hanover Trust Co. ("MHT"). The trustees contend that MHT took these assets pursuant to fraudulent conveyances within the meaning of § 67(d) of the Bankruptcy Act of 1898, former 11 U.S.C. § 107(d) (1976),[1] in satisfaction of debts arising from defaulted loans made, at the behest of the bankrupts, to companies that acted as sales agents for the bankrupts. The district court held, after a bench trial, that the loans against which MHT applied the bankrupts' property were supported by fair consideration and did not render the bankrupts insolvent, so that the transactions could not be set aside pursuant to § 67(d). Because we conclude that the district court did not apply the proper legal standards in considering the issues of fair consideration and insolvency, we vacate its judgment and remand the matter for further proceedings.
 
 I. HISTORY OF THE BANKRUPTS' BUSINESS
 
 2
 The bankruptcy of UMO and USN was part of the collapse of a sort of private banking empire controlled by Messrs. John M. Trent and Eugene Skowron. The Trent/Skowron companies were a major factor in what the plaintiffs have termed the "auxiliary banking system," a group of businesses that provide banking-type services primarily to lower-income persons who do not maintain ordinary checking accounts. As part of this system UMO and USN (sometimes referred to as "issuers") engaged in the business of issuing money orders. Defendant MHT was the principal banker for the Trent/Skowron network and, as detailed below, made loans to various members of the network and held as collateral assets owned by UMO and USN. As a result of the collapse of the Trent/Skowron network, an as yet undetermined, but undoubtedly quite large, number of money orders issued by UMO and USN became unredeemable and worthless. In the present litigation, the trustees of the issuers seek to recover for the benefit of purchasers of unredeemed UMO and USN money orders the value of certain collateral pledged by the issuers and applied by MHT to debts of other companies, most of which were Trent/Skowron affiliates. Resolution of the difficult legal questions raised by the trustees' appeal requires a fairly detailed recounting of the history of the Trent/Skowron enterprises.
 
 A. Basic Organization of the Enterprise
 
 3
 UMO, USN, and their parent corporation, International Express Co. ("International"), were apparently the central elements of the Trent/Skowron network. USN, a New York corporation formed by Trent and Skowron in 1962, sold money orders primarily in New York State. UMO, incorporated by Trent and Skowron in New Jersey in 1970, sold money orders primarily in California, Colorado, Massachusetts, New Jersey, Ohio, and West Virginia. Although the two firms had different sales territories, they were run as a single enterprise. Each was wholly owned by International; 89% of the stock of International was owned by Trent and Skowron.[2] UMO, USN, and International had the same principal officers and directors, including Trent as president and Skowron as secretary-treasurer. The funds of UMO and USN were mingled in a single bank account and were used fungibly to redeem either firm's money orders as they were presented. Although the companies' accounts were so "jumbled together" that their monthly sales rates could not be stated separately, their combined monthly sales volume amounted to about 900,000 money orders, having an average daily face value of about $1,850,000.
 
 
 4
 UMO and USN did not sell their money orders directly to the public. Instead, each firm enlisted a number of small businesses in its sales territory to act as sales agents. Although a variety of retail stores, particularly drug stores, acted as sales agents in smaller communities, the firms' principal sales agents were check cashing establishments located in large cities.[3] These check cashing "stores" were well situated to sell money orders, for they were equipped for the safe handling of large amounts of money, and their check cashing services provided customers with the cash needed to buy the bankrupts' money orders. By the same token, the sale of money orders aided the check cashers in their principal business by reducing the cash outlays associated with it. This symbiotic relationship with the check casher sales agents was vital to the money order issuers. Robert Sparago, an officer and former general counsel[4] of both UMO and USN, testified that the check cashers did "the major part of the money order business of USN" and that "(w)ithout the check cashers there was no USN." UMO was similarly dependent upon its check casher sales agents.
 
 
 5
 At some point in the development of their businesses, Trent and Skowron sought to expand into the check cashing business. Toward this end they formed Empire Small Business Investment Corp. ("Empire"),[5] which they used as a holding company to acquire a controlling 50% interest in National Payroll Services Ltd. ("National"), itself a holding company that owned eleven check cashing corporations that operated at 18 locations, and to acquire a controlling 331/3% interest in TWO Check Cashing Corp. ("TWO"), another holding company that owned four check cashing outlets. All of the check casher subsidiaries of National and TWO were located in New York City, and all were sales agents of USN.
 
 
 6
 Thus, for the period relevant to this appeal, the relationships between Trent and Skowron and the principal businesses they controlled can be summarized schematically as shown below:[6]
 
 
 7
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 8
 B. The Banking Arrangements and the System of Guarantees
 
 
 9
 Because their check cashing business required continuous outlays of currency, the check cashers who served as sales agents for UMO and USN experienced a constant need for cash, a need that the inflow of funds from the sale of money orders could never wholly satisfy. The resulting imbalance posed obvious problems for both the check cashers and the money order issuers. If the cashers ran out of currency, they could not conduct their principal business; if the cashers became unable to cash checks, then many prospective customers of UMO and USN would be unable to obtain the cash needed to purchase money orders.
 
 
 10
 In addition, the currency shortfalls of the check cashers presented a somewhat more fundamental problem for the money order issuers. To the extent that a check casher ran low on cash, he would be tempted to retain the proceeds of his money order sales for use in his own business rather than remit them promptly to the issuer. Such foot-dragging could have disastrous consequences for the issuer, whose profit depends largely on his freedom to exploit the "float" inherent in his business-i. e., on his ability to use and invest the proceeds of money order sales between the time of purchase and the time when the money orders are presented for collection. Any delay in the remittance of sales proceeds to the issuer necessarily diminishes the "float," and therefore the profitability of the issuer's business.[7]
 
 
 11
 As a means of resolving these problems Trent and Skowron settled on short-term bank financing for the check cashers. In 1964, the two entrepreneurs caused USN to arrange for certain of its check casher sales agents to receive loans from MHT, with which USN maintained an account. Under the initial 1964 arrangement, MHT opened a "loan line" against which USN's check casher sales agents were permitted to borrow for three-day periods. Each month, Trent and Skowron submitted to MHT a schedule of requested loans to each check casher for each day of the month; the daily loans were based on estimates of each casher's varying daily needs for cash. After reviewing and approving the schedules, MHT would extend the specified credit for each day to each of the listed check cashers. This three-sided financing arrangement, whereby MHT loaned money to the check cashers according to the schedules submitted by Trent and Skowron, remained an essential operating procedure until the Trent/Skowron network collapsed in January 1977.
 
 
 12
 The initial 1964 loan line for the check cashers was provided by MHT on the basis of the check cashers' own credit. In 1966, Trent and Skowron obtained from MHT a second, supplementary line of credit for the check cashers. Under this arrangement, Trent and Skowron pledged certain securities, owned by them, as collateral, and MHT extended credit to the check cashers, in accordance with monthly schedules submitted by Trent and Skowron as described above, in a total amount that was fixed as a varying multiple of the value of the collateral. Thus, under the 1966 arrangement, the check cashers were able to borrow under the 1964 loan lines (which remained in place) to the extent of their own creditworthiness, and were able to draw on the supplementary loan line, on the strength of Trent and Skowron's collateral, as necessary to meet the peak demands of their business. The debts incurred under either line of credit were of course to be repaid by the check cashers themselves.
 
 
 13
 On November 13, 1970, Trent and Skowron formalized, and altered somewhat, their relationship with MHT and the check cashers by executing the first of a series of agreements whereby they guaranteed the debts of the check cashers to MHT. Under this agreement, Trent and Skowron personally guaranteed "the prompt and unconditional payment of all obligations" of the check cashers to MHT under the loan lines. As security for their obligations under the guarantee, Trent and Skowron gave MHT a lien on their accounts at the bank and pledged other property belonging to them, apparently including the securities that were previously pledged under the 1966 arrangement. Under the 1970 guarantee, the check cashers' loan lines were no longer tied to their own creditworthiness, but were predicated entirely on the financial strength of Trent and Skowron. The permissible borrowings of individual check cashers continued to be determined on the basis of monthly schedules submitted by Trent and Skowron, and the maximum available credit was again set as a varying multiple of the collateral supplied by Trent and Skowron.
 
 
 14
 Apparently well aware of the size and complexity of the Trent/Skowron business interests, MHT subsequently obtained a series of guarantees and cross-guarantees from various entities in the network in order to ensure that it would be able to look to the assets of any of the Trent/Skowron entities in the event of default by the check cashers. In particular, USN and UMO each guaranteed the joint and individual debts of Trent and Skowron, Trent and Skowron jointly guaranteed the separate debts of USN and UMO, and USN and UMO guaranteed each other's debts. Most of the guarantees were executed in 1972, although some of the Trent/Skowron entities executed additional guarantees in later years as MHT deemed them necessary. See infra.
 
 
 15
 Under each guarantee agreement, the guarantor pledged to MHT, or granted MHT a lien on, certain of its assets as security for its obligations under the guarantee. Of particular importance in this appeal are the security provisions contained in the guarantees given by the money order issuers, several of which were executed on November 28, 1972. On that day, in guarantees of the debts of Trent and Skowron and those of UMO, USN granted MHT a lien on "any and all moneys, securities and any and all other property" of USN then or thereafter in MHT's actual or constructive possession. On the same day, UMO executed a guarantee of Trent and Skowron's debts, granting MHT a similar broad lien. Subsequently, in a guarantee of Trent and Skowron's debts dated July 30, 1975, UMO pledged as collateral some 44,000 shares of stock and other securities. Finally, in a guarantee of Trent and Skowron's debts dated September 21, 1976, UMO repledged these securities holdings, as modified by substitutions of collateral that had taken place since the execution of the July 1975 guarantee, and also pledged as new collateral a $187,000 certificate of deposit held in its name.
 
 
 16
 For several years after 1964, the Trent/Skowron enterprises functioned fairly smoothly under this system of loan lines and guarantees. After the execution of the initial guarantee in 1970, the number of check cashers financed under the loan lines increased. Although MHT had initially loaned money only to New York City check cashers who were sales agents of USN, check cashers who were sales agents of UMO located in Colorado, Massachusetts, New Jersey, and Ohio soon became regular borrowers under the loan lines. In addition, at various times between 1972 and December 27, 1976, MHT loaned money directly to UMO on the strength of the system of guarantees; on some or all of these occasions, UMO loaned the funds it borrowed from MHT to its check casher sales agents in California. At their peak, the check cashers' combined borrowings from MHT totaled approximately $12 million, and were secured by $3 million worth of collateral under the guarantees.
 
 C. The Food Stamp Episode
 
 17
 In 1972, MHT and the Trent/Skowron enterprise joined forces in selling food stamps to the public. Pursuant to an agreement with the New York City Department of Social Services (the "City Department"), the agency that supervised food stamp operations in metropolitan New York, MHT became a vendor of food stamps, selling them on a wholesale basis to sub-vendors, including check cashers, who retailed them to recipients. Like the sale of money orders, the sale of food stamps benefited the check cashers by reducing somewhat the outflow of cash associated with their principal business. Many of USN's check casher sales agents, including those owned by the Trent/Skowron affiliates National and TWO, acted as sub-vendors of food stamps supplied by MHT.
 
 
 18
 Applicable federal regulations required sub-vendors of food stamps to pay to the City Department the proceeds of their food stamp sales on a daily or weekly basis, depending on the volume of food stamp sales. Nonetheless, several check cashers, including some sales agents owned by National and TWO, failed to remit these funds in timely fashion, using the resulting "float" to finance their check cashing operations. In 1976, an audit of National conducted by the United States Department of Agriculture ("USDA") revealed that its check cashers had accumulated food stamp arrears totaling $300,000. Apparently TWO's check casher subsidiaries were also substantially in arrears on their food stamp payments.
 
 
 19
 MHT insisted that Trent and Skowron clear up the food stamp arrears of National and TWO, and apparently went so far as to threaten to cut off credit to the offending check cashers-a move that would have sharply curtailed USN's money order business-if the arrears were not promptly paid. The method adopted for resolving the food stamp problem was an increase in the loan lines available to the affected check cashers. On September 16, 1976, MHT made an additional $500,000 in credit available to the affected firms, increasing National's debt ceiling under the loan line from $1,250,000 to $1,550,000, and increasing TWO's from $290,000 to $490,000. National and TWO used the extra funds provided under the loan lines to settle the food stamp accounts of their check casher subsidiaries. Under the system of guarantees, Trent, Skowron, and their affiliated companies, including USN and UMO, were obligated to repay the increased loan line debts of National and TWO.
 
 D. Investigation, Collapse, and Setoff
 
 20
 A few months before MHT increased its loan lines to National and TWO in order to enable them to settle their food stamp accounts with the City Department, the first warning note of the financial instability of the Trent/Skowron empire was sounded. An informal examination of UMO's financial condition conducted by the California Banking Department[8] expressed the opinion that UMO was insolvent as of March 31, 1976. At that time, UMO's books indicated that the company's net worth was $2,474,000. The California bank examiner who reviewed UMO's finances concluded, however, that some $3,035,000 in assets claimed by UMO on its books should not have been in its capital accounts because they were held not in UMO's name, but in the names of various other companies and persons associated with the Trent/Skowron network. Once these assets were removed from the books, UMO had a negative net worth of roughly $561,000. In addition, the examiner opined that UMO's book value should be further reduced by eliminating from its capital accounts approximately $1.9 million in loans receivable that the examiner considered uncollectable, and by eliminating certain intangible assets valued on the books at about $878,000. Taking into account all the adjustments recommended in his report, the California examiner concluded that UMO had a negative net worth of some $3,645,000. He expressed the opinion that UMO was operating in violation of several California banking laws, particularly those specifying minimum levels of capital and liquidity, and that the company had frequently engaged in "illegitimate float transactions, check swaps, and transactions that appear to be (check) kites." UMO officials were permitted to review the report, and they sharply, but unsuccessfully, disputed many of the adjustments made by the examiner.[9]
 
 
 21
 A few months after the California authorities conducted their review of UMO, the Trent/Skowron empire began to show outward signs of collapse. The financial problems of National and TWO became particularly acute. Since some time in 1975, National and TWO had not actually repaid the loans extended to them under the loan line, but had simply rolled the loans over every three days as they became due, repaying the old loan with the proceeds of the new one. Between September 1976, when the check casher subsidiaries of National and TWO borrowed the additional $500,000 under the loan lines in order to eliminate their food stamp arrears, and December 1976, National and TWO began to overdraw their accounts at MHT with alarming frequency. At a meeting with MHT personnel held on December 21, 1976, an official of these firms apparently acknowledged that they were in financial difficulty and unveiled a rather desperate plan to raise capital by selling their check casher subsidiaries to the individuals who managed the various check cashing outlets. This plan was never effectuated. On December 27, 1976, National and TWO fell into default on their borrowings from MHT under the December 24, 1976 loan lines, which amounted to $1,550,000 and.$390,000, respectively. Despite these defaults, MHT loaned a total of $1 million directly to the firms' check casher subsidiaries on December 31, 1976.[10] In connection with the December 31 loan, USN executed on that day a guarantee of the debts of National and TWO and their subsidiaries.
 
 
 22
 By December 1976, UMO also had begun to experience financial difficulties. On December 6, for reasons that were not explained at trial, MHT discontinued the extension of credit under the loan lines to UMO check casher sales agents, except for those owned by Propper Demonstration Sales Corp. ("Propper"), a company that operated a number of check cashing outlets and sold UMO money orders in Massachusetts, Ohio, and New Jersey, but was not otherwise affiliated with Trent/Skowron. Propper received $300,000 under the loan lines at some time after December 6, 1976.
 
 
 23
 Early in January 1977, the Trent/Skowron empire collapsed completely. Upon learning of the severe financial problems facing the Trent/Skowron firms, several banks with which USN and UMO maintained accounts discontinued their former practice of permitting the issuers to draw against checks deposited to their accounts on the day after deposit, requiring instead that they wait until collection before drawing. With the loss of this "next day availability" of check deposits, USN and UMO lost at least one day's worth of the "float" of funds on which their viability depended, at a total cost that Trent, testifying at trial, put at about $2 million. Almost immediately, USN and UMO became unable to redeem their money orders as they were presented for collection.
 
 
 24
 On January 10, 1977, the New York State Banking Department ordered USN to discontinue the sale of money orders. On January 12, 1977, UMO petitioned for an arrangement under Chapter XI of the Bankruptcy Act, announcing that it was unable to redeem outstanding money orders having a total face value exceeding $5.3 million. UMO was eventually adjudicated a bankrupt on December 1, 1978. On January 20, 1977, USN filed a petition in bankruptcy, announcing that it was unable to redeem outstanding money orders with a face value of about $5 million. USN was adjudicated a bankrupt the next day.
 
 
 25
 MHT quickly moved to protect itself from losses on its outstanding loans to the financially troubled check cashers National, TWO, and Propper. Because Trent and Skowron did not honor their obligations, under the guarantees executed by them, to repay these check cashers' debts, MHT looked to the assets of USN and UMO that had been pledged in guarantee of the debts of Trent and Skowron. On January 11, 1977, evidently acting pursuant to the lien provisions of the guarantees executed by USN and UMO, MHT seized the funds remaining in the checking accounts of USN and UMO, about $295,000 and $80,000, respectively, and applied the funds as partial repayment of the loans, totaling $1,550,000 and overdue since December 27, 1976, that it had extended to National's check casher subsidiaries under the loan lines on December 24, 1976. Subsequently, acting in accordance with a stipulation entered into with the bankruptcy trustees, under which the trustees reserved their rights to challenge the transaction, MHT sold for a total of approximately $1,387,000 the various securities pledged by UMO as collateral under its September 21, 1976, guarantee of the debts of Trent and Skowron. MHT applied roughly $78,000 of the sale proceeds as an additional partial repayment of the National loans of December 24, 1976. It also applied roughly $318,000 as partial repayment of the December 24, 1976 loans to the TWO affiliates, whose indebtedness had totaled.$390,000 and had been overdue since December 27, 1976.[11] An additional $531,000 was applied to debts of Propper; these included a balance of $300,000 that had been overdue under the loan lines since sometime after December 6, 1976, a $172,000 overdraft, and interest. On November 27, 1978, MHT delivered to plaintiff Lumbard, UMO's trustee, the balance of the sale proceeds, approximately $459,000.
 
 
 26
 From these setoffs arose the present litigation.
 
 II. THE PROCEEDINGS BELOW
 
 27
 On January 12, 1979, plaintiffs Rubin and Lumbard, acting in their capacities as bankruptcy trustees of USN and UMO, commenced the present action against Trent, Skowron, and MHT, seeking to recover for the benefit of the bankrupts' creditors-comprised principally of holders of unredeemed money orders-the value of the various assets of USN and UMO that had been applied to the debts of National, TWO, and Propper pursuant to the system of guarantees. In their amended complaint, the trustees asserted ten causes of action of which only two, counts 2 and 10, are at issue in this appeal.[12]
 
 
 28
 In count 2, plaintiff Lumbard, UMO's trustee, asserted that the guarantees of the debts of Trent and Skowron executed by UMO on November 28, 1972, July 30, 1975, and September 21, 1976, and the granting of liens and pledges of collateral made by UMO in connection with those guarantees, were fraudulent conveyances within the meaning of § 67(d)(2)(a), (b) of the Bankruptcy Act, 11 U.S.C. § 107(d)(2)(a), (b), and were therefore void against the bankruptcy trustee under § 67(d)(6) of the Act, 11 U.S.C. § 107(d)(6). Under this theory UMO's trustee sought to recover from MHT approximately $1,008,000; this amount apparently represented the $1,387,000 received by MHT from the sale of securities pledged by UMO under the September 1976 guarantee, plus the $80,000 seized by MHT from UMO's checking account pursuant to the lien contained in its November 1972 guarantee, less the $459,000 in excess proceeds from the sale of UMO's collateral that MHT had returned to the trustee in November 1978.
 
 
 29
 In count 10, the so-called food stamp count, both trustees asserted, on behalf of their respective bankrupts, that the various guarantees executed by USN and UMO from November 28, 1972 through December 31, 1976, and the various liens and pledges associated with those guarantees, were void as fraudulent conveyances under the Bankruptcy Act insofar as they pertained to the loan line debts of National and TWO incurred on and after September 16, 1976, as a means of settling their food stamp accounts with the City Department. Although the food stamp-related debts of National and TWO apparently never exceeded $500,000, the trustees sought to recover under count 10 approximately $1,489,000. This amount apparently represented the $1,387,000 received from the sale of UMO's securities and the $80,000 seized from its checking account, plus the $295,000 seized from USN's checking account pursuant to the liens created by USN's guarantee of the debts of Trent and Skowron executed in November 1972 and its guarantee of the debts of National and TWO executed on December 31, 1976, plus $186,000 received from the sale of other securities held in the issuers' names that were in MHT's custody and were seized pursuant to the lien provisions of the various guarantees, less the $459,000 that MHT returned to plaintiff Lumbard in November 1978.
 
 
 30
 After a bench trial, the district court ruled for MHT. Noting that § 67(d) of the Bankruptcy Act required the trustees to prove, with respect to each of the fraudulent conveyance counts, both a lack of fair consideration to the bankrupts in the challenged transactions and insolvency or insufficiency of capital of the bankrupts at the time of the transactions, the court held that the trustees had failed to prove lack of fair consideration with respect to each count. In analyzing the fair consideration issues, the district court emphasized the fact that despite apparent barriers of corporate form, the Trent/Skowron enterprises were really "one ball of wax." On count 2, the court held that the November 1972 and September 1976 guarantees, pursuant to which MHT had applied UMO assets to offset the debts of USN's sales agents National and TWO and of UMO's sales agent Propper, were supported by fair consideration because MHT had occasionally loaned money directly to UMO and its sales agent Propper on the strength of those guarantees, and because UMO had received "indirect benefits" from loans to National and TWO by virtue of its "affiliation and identity of interest with" those firms. Similarly, on count 10, the court reasoned that the increased obligations assumed by USN and UMO under the guarantees in connection with the September 1976 expansion of the loan lines for National and TWO were supported by fair consideration because the entire Trent/Skowron enterprise benefited from the settling of the delinquent food stamp accounts made possible by the increased loans.
 
 
 31
 Alternatively, at least with respect to UMO, the court held that the trustee had failed to carry his burden of showing insolvency or insufficiency of capital.[13] Although the court noted the opinion of the California State Banking Department that UMO was insolvent as of March 31, 1976, it discounted this conclusion because the California examiner had considered UMO separately from its affiliated companies. The court credited testimony of Trent and Sparago that UMO was solvent until at least the last week of 1976, and it observed that UMO's books showed a positive net worth until sometime in 1977. Finally the court noted that although an audit of UMO as of January 31, 1977 had initially shown a $6.1 million deficit, the auditors had ultimately disclaimed any opinion concerning the company's solvency. Viewing the evidence of insolvency as unpersuasive, the court found that the evidence tended to show that UMO was solvent until at least the last week of December 1976, and that therefore insolvency at the pertinent time had not been proven.
 
 
 32
 Accordingly, the district court dismissed the claims asserted against MHT in counts 2 and 10 and ordered the immediate entry of judgment in MHT's favor, pursuant to Fed.R.Civ.P. 54(b).
 
 
 33
 On appeal, the trustees renew their contentions that the obligations to repay the debts of National, TWO, and Propper assumed by USN and UMO under the system of guarantees were not supported by fair consideration, that these obligations were incurred at a time when USN and UMO were insolvent, and that MHT must therefore return to the trustees, pursuant to § 67(d) of the Bankruptcy Act, the value of the collateral given by the bankrupts that was applied to the debts of National, TWO, and Propper. For the reasons below we conclude that the district court's rulings as to fair consideration and insolvency were based on erroneous legal principles, and that the judgment must be vacated and the matter remanded for further proceedings.
 
 III. DISCUSSION
 
 34
 When an overburdened debtor perceives that he will soon become insolvent, he will often engage in a flurry of transactions in which he transfers his remaining property, either outright or as security, in exchange for consideration that is significantly less valuable than what he has transferred. Although such uneconomical transactions are sometimes merely final acts of recklessness, the calculating debtor may employ them as a means of preferring certain creditors or of placing his assets in friendly hands where he can reach them but his creditors cannot. Whatever the motivation, the fraudulent conveyance provisions of § 67(d) of the Bankruptcy Act, 11 U.S.C. § 107(d), recognize that such transactions may operate as a constructive fraud upon the debtor's innocent creditors, for they deplete the debtor's estate of valuable assets without bringing in property of similar value from which creditors' claims might be satisfied. In addition, § 67(d) recognizes that the incurring of an obligation chargeable against the debtor's property, as distinguished from the actual grant of an interest in that property, may unfairly deplete the debtor's estate if the debtor does not receive in exchange a consideration roughly equal in value to the obligation incurred. Thus, § 67(d)(2) provides in relevant part as follows:
 
 
 35
 Every transfer made and every obligation incurred by a debtor within one year prior to the filing of a petition initiating a proceeding under this title by or against him is fraudulent (a) as to creditors existing at the time of such transfer or obligation, if made or incurred without fair consideration by a debtor who is or will be thereby rendered insolvent, without regard to his actual intent; or (b) as to then existing creditors and as to other persons who become creditors during the continuance of a business or transaction, if made or incurred without fair consideration by a debtor who is engaged or is about to engage in such business or transaction, for which the property remaining in his hands is an unreasonably small capital, without regard to his actual intent ....
 
 
 36
 Section 67(d)(6) of the Act, 11 U.S.C. § 107(d)(6), empowers the bankruptcy trustee to set aside transfers made or obligations incurred on uneconomical terms, and to recover for the benefit of creditors the value of the property removed from the debtor's estate through such transactions.
 
 
 37
 In the present case, in order to prove their claims that UMO's and USN's guarantees of the obligations of National, TWO, and Propper were constructively fraudulent, and therefore voidable under criteria set forth in § 67(d)(2)(a) and (b), the trustees were required to show: (1) that USN and UMO made transfers or incurred obligations to MHT within one year of the January 1977 filings of their bankruptcy petitions, (2) that these transactions were entered into without "fair" consideration to USN and UMO, and (3) that the bankrupts were, or were rendered, insolvent or insufficiently capitalized as a result.[14] We discuss these issues in turn.
 
 A. The Timing of the Transactions
 
 38
 Subsections 67(d)(2)(a) and (b) apply only to transfers and obligations made or incurred "within one year prior to the filing" of a bankruptcy petition. With respect to both counts 2 and 10, the trustees contend that USN and UMO incurred obligations as guarantors of the debts of National, TWO, and Propper whenever those firms drew on the loan lines, and that because National, TWO, and Propper drew on the loan lines in September and December 1976, within one year of the January 1977 filings of their bankruptcy petitions, the statutory timing requirement was met. MHT responds that USN and UMO made transfers and incurred obligations only in 1972 and 1975, when they executed their principal guarantees and created the various security interests under them, i. e., more than one year before the January 1977 filing dates. The district court expressed some doubt about the soundness of the trustees' position, but did not reach the issue in view of its ruling that the trustees had failed to show lack of fair consideration and, in the case of UMO, insolvency. We think the trustees' position is correct.
 
 
 39
 At the outset, we note that there are certain factual difficulties with MHT's position on this point. As recounted above, USN and UMO executed their initial guarantees in 1972, giving as security liens on their checking accounts and other assets held or to be held by MHT; UMO executed a second guarantee in 1975, pledging certain stocks and bonds as collateral. Although these transactions occurred more than one year before the January 1977 filing dates, USN and UMO each executed an additional guarantee and gave additional security at times well within the one year period: in September 1976, UMO guaranteed the debts of Trent and Skowron, specifically pledging as collateral many of the securities already pledged under the 1975 agreement, pledging as new collateral a $187,000 certificate of deposit, and, as it had done in 1972, granting MHT a lien on all cash and other property of UMO held, actually or constructively, by MHT at that time or in the future; and on December 31, 1976, USN guaranteed the debts of National and TWO in connection with the loans made that day to those firms' check casher subsidiaries, granting as security a lien on all cash and other property of USN actually or constructively held by MHT at that time or in the future, precisely as it had done in the 1972 agreement. Thus, even if we were to agree with MHT that the execution of the guarantees constituted the operative statutory events, we would probably conclude that those events occurred when the last guarantees were executed late in 1976, well within the one-year period, and that the issuers "made" "transfer(s)" at those times, at least to the extent that they gave new collateral.
 
 
 40
 Nonetheless, and regardless of the significance under § 67(d) of the execution of the 1976 guarantees, we conclude that both USN and UMO "incurred" "obligation(s)" within the meaning of the Act on or about September 16, 1976, when National and TWO drew an additional $500,000 against their increased credit line to cover their food stamp arrearages, and in December 1976, when National, TWO, and Propper last drew on the loan lines. Whenever National, TWO, and Propper borrowed under the loan lines, they of course incurred an obligation of repayment under the terms of their financing agreements with MHT. At the same time, as principal guarantors of the loan line debts under the system of guarantees, Trent and Skowron became contingently liable to discharge the check cashers' obligations if those firms defaulted. Similarly, USN and UMO, as secondary guarantors, became contingently liable if both the principal debtors and the principal guarantors defaulted. Undoubtedly, therefore, USN and UMO "incurred" an "obligation" of repayment, although admittedly a contingent one, whenever National, TWO, and Propper borrowed under the loan line, as they did in September and December 1976.
 
 
 41
 That the obligations thus incurred by USN and UMO were contingent on others' defaults does not remove them from the scope of § 67(d)(2). The statute does not distinguish between fixed and contingent obligations; rather, it applies to "every obligation incurred" within one year of filing, regardless of its nature. 11 U.S.C. § 107(d)(2) (emphasis added). While these obligations existed only because of the system of guarantees, it does not follow that the execution of the guarantees, rather than the creation of contingent liabilities under them, constituted the incurring of the obligations for purposes of § 67(d)(2). Even after the guarantees were executed, there could be no liability under them until MHT had actually loaned money to National, TWO, and Propper. Until the loans were made, there existed only a framework through which USN and UMO might incur obligations, but they had not done so yet.
 
 
 42
 Thus we conclude that USN and UMO "incurred" "obligation(s)" within the meaning of the Act when MHT loaned money to National, TWO, and Propper in December 1976. This event of course occurred within the one-year period dealt with by the statute.
 
 B. "Fair" Consideration
 
 43
 Even if the debtor has transferred property or incurred an obligation within one year of filing a bankruptcy petition, the trustee cannot set aside the transaction under § 67(d)(2), (a), (b) if the debtor received "fair" consideration for his property or obligation. "Fair" consideration under the Bankruptcy Act, which is defined in § 67(d)(1)(e), means more than just the "good and valuable" consideration needed to support a simple contract:
 
 
 44
 (C)onsideration given for the property or obligation of a debtor is "fair" (1) when, in good faith, in exchange and as a fair equivalent therefor, property is transferred or an antecedent debt is satisfied, or (2) when such property or obligation is received in good faith to secure a present advance or antecedent debt in an amount not disproportionately small as compared with the value of the property or obligation obtained.
 
 
 45
 11 U.S.C. § 107(d)(1)(e). The reason for this requirement is obvious: if the debtor receives property or discharges or secures an antecedent debt that is substantially equivalent in value to the property given or obligation incurred by him in exchange, then the transaction has not significantly affected his estate and his creditors have no cause to complain. By the same token, however, if the benefit of the transaction to the debtor does not substantially offset its cost to him, then his creditors have suffered, and, in the language of § 67(d), the transaction was not supported by "fair" consideration.
 
 
 46
 Three-sided transactions such as those at issue here present special difficulties under the § 67(d)(1)(e) definition of fair consideration. On its face, the statute appears to sanction, as supported by "fair" consideration, a transaction in which the debtor transfers property or incurs an obligation as security for the debt of a third person, provided that the debt is "not disproportionately small" in comparison to that property or obligation. Nonetheless, if the debt secured by the transaction is not the debtor's own, then his giving of security will deplete his estate without bringing in a corresponding value from which his creditors can benefit, and his creditors will suffer just as they would if the debtor had simply made a gift of his property or obligation. Accordingly, courts have long recognized that "(t) ransfers made to benefit third parties are clearly not made for a 'fair' consideration," and, similarly, that "a conveyance by a corporation for the benefit of an affiliate (should not) be regarded as given for fair consideration as to the creditors of the conveying corporations." 4 Collier on Bankruptcy P 67.33, at 514.1-14.2 (14th ed. 1978) (citing cases). See also In re Christian & Porter Aluminum Co., 584 F.2d 326, 337 (9th Cir. 1978); Bennett v. Rodman & English, Inc., 2 F.Supp. 355 (E.D.N.Y.), aff'd per curiam, 62 F.2d 1064 (2d Cir. 1932).
 
 
 47
 The cases recognize, however, that a debtor may sometimes receive "fair" consideration even though the consideration given for his property or obligation goes initially to a third person. As we have recently stated, although "transfers solely for the benefit of third parties do not furnish fair consideration" under § 67(d)(1)(e), the transaction's benefit to the debtor "need not be direct; it may come indirectly through benefit to a third person." Klein v. Tabatchnick, 610 F.2d 1043, 1047 (2d Cir. 1979) (emphasis added). Accord, Williams v. Twin City Co., 251 F.2d 678, 681 (9th Cir. 1958); McNellis v. Raymond, 287 F.Supp. 232, 238-39 (N.D.N.Y.1968), aff'd in relevant part, 420 F.2d 51 (2d Cir. 1970). If the consideration given to the third person has ultimately landed in the debtor's hands, or if the giving of the consideration to the third person otherwise confers an economic benefit upon the debtor, then the debtor's net worth has been preserved, and § 67(d) has been satisfied-provided, of course, that the value of the benefit received by the debtor approximates the value of the property or obligation he has given up. For example, fair consideration has been found for an individual debtor's repayment of loans made to a corporation, where the corporation had served merely as a conduit for transferring the loan proceeds to him. McNellis v. Raymond, supra. Cf. Mayo v. Pioneer Bank & Trust Co., 270 F.2d 823 (5th Cir. 1959), cert. denied, 362 U.S. 962, 80 S.Ct. 878, 4 L.Ed.2d 877 (1960) (fair consideration found for corporate debtor's repayment of loan to its sole stockholder where stockholder had contributed loan proceeds to corporation's capital). Similarly, fair consideration will often exist for a novation, where the debtor's discharge of a third person's debt also discharges his own debt to that third person, see Barr & Creelman Mill & Plumbing Supply Co. v. Zoller, 109 F.2d 924, 926 (2d Cir. 1940), and it may sometimes be found in multi-party transactions of greater intricacy, see, e. g., Klein v. Tabatchnick, supra (fair consideration might exist for corporation's grant of security interest in corporate property in exchange for secured party's pledge of personal property as collateral for bank loan to majority stockholder, who loaned proceeds to corporation). In each of these situations, the net effect of the transaction on the debtor's estate is demonstrably insignificant, for he has received, albeit indirectly, either an asset or the discharge of a debt worth approximately as much as the property he has given up or the obligation he has incurred. Thus, although these "indirect benefit" cases frequently speak as though an "identity of (economic) interest" between the debtor and the third person sufficed to establish fair consideration, see, e. g., McNellis v. Raymond, supra, 287 F.Supp. at 238; In re Winslow Plumbing, Heating & Contracting Co., 424 F.Supp. 910, 914-15 (D.Conn.1976), the decisions in fact turn on the statutory purpose of conserving the debtor's estate for the benefit of creditors.
 
 
 48
 With these principles in mind, we turn to the parties' contentions concerning the obligations assumed by USN and UMO to repay the debts of National, TWO, and Propper.
 
 
 49
 The trustees' position is very simple. Pointing out that USN and UMO incurred obligations under their guarantees as security for advances made not to themselves but to National, TWO, and Propper, they argue that the advances did not confer any benefit upon USN and UMO, and that the money order issuers' obligations to repay those advances were therefore unsupported by fair consideration. MHT, seizing on the indirect benefit cases, adopts a subtler position. With respect to count 2, which pertained only to UMO, MHT contends that its loans to National, TWO, and Propper provided fair consideration for UMO's guarantee of their debts because the loans enabled the check cashers to settle their accounts with USN and UMO more quickly, thus increasing both the pool of funds available to redeem UMO money orders and the "float" from which UMO's profits were derived.[15] Similarly, with respect to count 10, which pertained to both issuers, MHT asserts that there was fair consideration to both USN and UMO for the food stamp-related increase in the loans to National and TWO because the increased loans replaced the food stamp "float" as a source of working capital for the check cashers, enabling them to stay in business and securing the stream of money order sales proceeds relied on by both issuers. Finding that there was an "identity of interest" between USN and UMO on the one hand and National and TWO on the other, the district court agreed with MHT. We conclude that the district court should reconsider the matter after additional factfinding on remand.
 
 
 50
 Initially, we note that the trustees take too narrow a view of the fair consideration requirement of § 67(d). As was explained above, the fact that a third party initially receives the consideration given for the debtor's property or obligation does not automatically mean that fair consideration was lacking. Thus the simple fact that National, TWO, and Propper, rather than USN and UMO, received the loan line advances need not compel a ruling in favor of the trustees on this point. The relationships among the Trent/Skowron firms and Propper were such that the advances to National, TWO, and Propper very likely did facilitate transfers of funds from those firms to the bank account shared by USN and UMO, benefiting each of those firms to some degree. Accordingly, the district court did not err in rejecting the trustees' argument that the corporate separateness of the loan recipients from their guarantors necessarily precluded a finding of fair consideration.
 
 
 51
 On the other hand, the district court did err in accepting MHT's argument that the existence of any indirect benefit whatever to USN and UMO from the advances to National, TWO, and Propper meant that the issuers' obligations as guarantors were necessarily supported by fair consideration. In a transfer for security, § 67(d)(1)(e) requires that the present advance or antecedent debt be "not disproportionately small as compared with the value of the property or obligation" given by the bankrupt to secure it. In a three-sided transaction such as that presented here, it is not enough merely to compare the absolute amount of the third person's debt with the amount of security given by the bankrupt. The trustee, who has the burden of proving that the transaction was "without fair consideration," see 4 Collier on Bankruptcy, supra, P 67.43, at 620-21 (citing cases), could establish lack of fair consideration under § 67(d) by proving that the value of what the bankrupt actually received was disproportionately small compared to the value of what it gave. Accordingly, the court must attempt to measure the economic benefit, if any, that accrued to each bankrupt as a result of the third person's indebtedness, and it must then determine whether that benefit was "disproportionately small" when compared to the size of the security that that bankrupt gave and the obligations that it incurred.
 
 
 52
 The district court did not undertake such an analysis. The court observed that both USN and UMO "had a vital interest in inducing MHT to make ... loans to (National, TWO, and Propper)," and it stated that the issuers' "receipt of indirect benefits because of (their) affiliation and identity of interest with the direct recipients of the loans was receipt of fair consideration"; but it did not attempt to quantify the indirect benefits to either issuer or to compare those benefits with the obligations assumed by the issuers under the guarantees. Without such an analysis, it was impossible for the court to determine whether the estate of either issuer had been conserved in accordance with the principles of § 67(d), and it was therefore error for the court to conclude that those purposes had been satisfied.[16] Since the court's alternative ground for dismissal was also flawed, see Part C infra, we vacate the judgment of the district court and remand the matter for review of the fair consideration issue under the proper legal standards.
 
 
 53
 Given the complexity of the transactions and relationships at issue here, we think it advisable to detail the inquiry to be pursued on remand. First, the court must attempt to determine the extent to which the December 1976 loans to National and TWO increased remittances from those firms to USN, their principal in the money order business. Next, it must attempt to determine the extent to which UMO shared in the increased remittances to USN by virtue of the pooling of the issuers' funds. Similarly, it must attempt to determine the extent to which the December 1976 loans to Propper increased remittances from Propper to UMO, and the extent to which USN shared in any such increases by virtue of the pooling arrangement. The court must then compare its estimate of the value thus received by each issuer with the magnitude of the obligation charged against that issuer under its guarantee. If the value received by either issuer is found to be disproportionately small as compared with its obligation, then, to that extent, the trustee for that issuer will have proved lack of fair consideration, and the court must proceed to consider the insolvency issue, discussed below.[17] However, if either trustee fails to establish that the value is disproportionately small, the court must rule for MHT against that trustee.
 
 
 54
 In making the determinations and comparisons called for above, the court need not strive for mathematical precision. Section 67(d) requires only "fair" consideration, not a penny-for-penny exchange. At the same time, however, the court must keep the equitable purposes of the statute firmly in mind, recognizing that any significant disparity between the value received and the obligation assumed by either issuer will have significantly harmed the innocent creditors of that firm. Given the financial weakness of National and TWO revealed by the present record, it may well be that the trustees will be able to show that those firms absorbed much of the money provided them under the loan lines, remitting little or nothing to their principal, USN. Or it may be that USN received the lion's share of any remittances, perhaps even an amount properly proportionate to its obligations as guarantor, but that UMO's benefit from the loans was "disproportionately small." Of course, we leave these factual questions to the district court.
 
 C. Insolvency or Insufficiency of Capital
 
 55
 As the third principal element of their causes of action under § 67(d)(2)(a), (b), the trustees were required to show that USN and UMO were, or were rendered, insolvent or insufficiently capitalized when they incurred obligations under their guarantees in September or December 1976. Under § 67(d)(1)(d), a person is insolvent "when the present fair salable value of his property is less than the amount required to pay his debts." The statute does not define insufficiency of capital, and the amount of capital deemed sufficient under § 67(d)(2)(b) for the carrying on of a particular business will of course depend on its nature and size. We take up these issues separately with respect to the two debtors.
 
 1. Financial Status of UMO
 
 56
 The evidence concerning UMO's financial health was conflicting. Trustee Lumbard's principal proof of UMO's insolvency was the report of the California Banking Department, which opined that as of March 31, 1976, UMO had a negative net worth of at least $561,000, and perhaps as much as.$3.6 million. In addition, Lumbard adduced testimony of John Waters, an accountant and partner in Arthur Andersen & Co., who supervised an audit of UMO conducted shortly after it petitioned in bankruptcy; Waters testified that UMO had a capital deficit of approximately $6 million as of January 31, 1977, and that the results of his examination of UMO's finances were consistent with the conclusions drawn in the California report. On examination by the court, however, Waters stated that Arthur Andersen had ultimately disclaimed any opinion as to UMO's solvency "(b)ecause of significant uncertainties (concerning efforts "to reach the holders of money orders to firmly establish the liability," and concerning the outcome of the present and other litigation) that could not be resolved at that particular time." In addition, Sparago testified that UMO's books showed a net worth of some $2.4 million throughout 1976, and that the company's net worth was some $900,000 even if one of the most significant adjustments sought by the California authorities were made on its books. Similarly, Trent testified that UMO had "a positive net worth" until January 1977.
 
 
 57
 Reviewing this evidence, the court stated that the trustee, and the California report, had "artificially segregated (UMO) ... from the overall (Trent/Skowron) enterprise," and that the solvency or insolvency of the enterprise had not been shown. The court chose to credit the testimony of Trent and Sparago over the conclusions of the California report, and observed that UMO's "books ... showed a positive net worth at all relevant times well into 1977." The court discounted the testimony of Waters as to UMO's negative net worth, on the grounds that Waters had ultimately disclaimed any opinion respecting UMO's solvency and that his initial conclusions concerning UMO's financial position as of January 31, 1977 were "unhelpful in ascertaining the solvency of UMO at the time (months, even years earlier) when the guarantees were made, or even as of December 1976," when the disputed loans were made.[18] Accordingly, the district court concluded that UMO's trustee had failed to meet his burden of proving insolvency "at the time the guarantees were made." We are persuaded that this ruling was made in the context of incorrect legal standards, and that we must vacate the court's judgment and remand for further consideration in light of the principles set forth below.
 
 
 58
 First, we think the district court placed undue emphasis on the financial health of the Trent/Skowron enterprise as a whole as a determinant of UMO's solvency. Section 67(d)(2) condemns as fraudulent conveyances transactions entered into "by a debtor who is or will be thereby rendered insolvent ... (or) by a debtor who is engaged or is about to engage in (a) business or transaction, for which the property remaining in his hands is an unreasonably small capital." 11 U.S.C. § 107(d)(2) (emphasis added). Thus the insolvency issue hinges on the financial position of the debtor, not on that of related entities. Admittedly, the solvency or insolvency of controlling stockholders and related corporations may often shed some light on the fiscal soundness of a corporate debtor, and the district court did not err in considering the finances of Trent, Skowron, USN, and other affiliates in its effort to gauge the status of UMO. Nonetheless, the trustees were not required to prove that all of the Trent/Skowron entities were insolvent or insufficiently capitalized, or that as a whole the enterprise was in that condition. That burden pertained only to the debtor, UMO.
 
 
 59
 Second, to the extent that the court focused on UMO alone, its emphasis on the testimony concerning book value suggests that the court lost sight of the statutory definition of insolvency, which is cast in terms of "the present fair salable value of (the debtor's) property." The market value of particular property may of course differ substantially from its book value, and the market value of certain of UMO's assets may have been greater or less than their book value. While it was the parties' responsibility to bring any such disparities to the court's attention and to establish market value if the need arose, we think that the court may have overlooked the possibility of such disparities in reviewing the welter of figures with which it was presented.
 
 
 60
 Finally, we think the court's uncertainty concerning the time when the relevant obligations were incurred may have impeded its examination of the questions of insolvency and insufficiency of capital. The district court stated that UMO's trustee had failed to prove that UMO was insolvent "at the time the guarantees were made." As discussed above, however, UMO's incurring of obligations as guarantor must also be tested as of December 1976, when the loans for which it was charged were made. Accordingly, the question for decision was whether UMO was, or was rendered, insolvent or insufficiently capitalized as of December 1976, not just as of September 1976, when it executed its third guarantee in connection with the food stamp loans, or as of any earlier time.
 
 
 61
 In view of the court's misapprehensions of the legal framework within which proof as to UMO's insolvency should have been evaluated, the dismissal of Trustee Lumbard's claims for failure of proof of insolvency or insufficiency of capitalization cannot stand. On remand the district court should reconsider the matter, taking additional evidence if necessary, under the proper standards.
 
 2. Financial Status of USN
 
 62
 The question of USN's insolvency presents us with a rather different problem. As nearly as we can tell, trustee Rubin did not offer proof that USN was insolvent or insufficiently capitalized; certainly the district court did not purport to rule on the issue, and the matter has not been mentioned at any time in this appeal. Possibly Rubin sought to establish USN's insolvency simply by showing the proximity in time between, on the one hand, USN's assumption of obligations in connection with loans to National, TWO, and Propper in December 1976 and, on the other hand, its debarment from the money order business by the New York State Banking Department on January 10, 1977, and its adjudication as a bankrupt on January 21, 1977. If this was his intention, however, he apparently has not yet invited any court to consider the theory. Accordingly, we must consider whether Rubin should be given an opportunity to pursue this issue on remand, or whether we should simply affirm the district court's dismissal of Rubin's claims on the ground of failure to prove this crucial element of his cause of action.
 
 
 63
 Ordinarily, of course, strong policies favoring finality in litigation and conservation of judicial resources lead an appellate court to disregard contentions that a party has not asserted at trial or has failed to raise on appeal. Were Rubin suing in his own right, we would not hesitate to levy this most appropriate sanction for inattention to vital detail. In the present case, however, Rubin appears not as an entirely self-interested private litigant, but as a trustee, representing the interests of the creditors of USN. Undoubtedly numerous, these creditors-primarily purchasers of USN money orders-possess relatively small individual claims, but are likely to have suffered with disproportionate severity during the long period that those claims have remained unsatisfied. We exercise our discretion in their favor and instruct the district court to consider the issue of USN's insolvency on remand, if trustee Rubin wishes to pursue it. Cf. Cohen v. West Haven Board of Police Commissioners, 638 F.2d 496, 500 n.6 (2d Cir. 1980). Otherwise, we instruct the court to enter judgment in favor of MHT with respect to Rubin's claims.
 
 CONCLUSION
 
 64
 We vacate the judgment of the district court and remand the matter for further consideration of the issues of fair consideration and insolvency in accordance with this opinion.ORDER FILED OCTOBER 1, 1981
 
 
 65
 Upon the filing of our opinion in the above matter on September 21, 1981, counsel for appellee directed our attention to a pretrial stipulation between the parties, the effect of which may not have been properly reflected in our opinion. This order is intended to clarify, with respect to the USN guarantees and the loans to Propper, our understanding of the issues decided in the district court and presented on this appeal.
 
 
 66
 We understand that when, prior to trial, the parties stipulated that Count 3 of the amended complaint would be withdrawn, the paragraphs of the amended complaint that had alleged that USN's 1972 and 1976 guarantees constituted fraudulent conveyances were deemed deleted from Count 10. We have viewed the pretrial stipulation not in a vacuum, but in the context of the district court's rulings on the merits of the case after trial. Appellee did not challenge before us the correctness of the district judge's view of the scope of the matters tried before him.
 
 
 67
 After trial, the district court viewed Count 10 as continuing to allege fraudulent conveyances with respect to USN's guarantees. The discussion section of its opinion began as follows:
 
 
 68
 Both Counts 2 and 10 assert claims that MHT engaged in a fraudulent conveyance when, pursuant to the guarantees of USN and UMO, it applied their assets to the debts of the check cashers.
 
 
 69
 (At 454.) The court proceeded to review the adequacy of the consideration for all the guarantees, including USN's (At 457), and to consider whether MHT's use of the guarantees of either UMO or USN constituted an unconsented-to modification of the underlying agreements and discharged the guarantees (At 457-458). We thus do not understand the stipulation to have removed from issue the contention that fraudulent conveyances were made pursuant to the USN guarantees.
 
 
 70
 It is possible, however, that the stipulation had two effects not clear to us on appeal. First, the stipulation may have been viewed as eliminating a claim that USN's 1976 guarantee itself was a transfer made or an obligation incurred within one year prior to the filing of USN's bankruptcy petition. This question was not dealt with by the district court, perhaps because it concluded that the stipulation removed that issue. If this was the construction placed on the stipulation by the district court and the parties, the references in our opinion to USN's guarantee of December 31, 1976, at page 4904, lines 18-19, and page 4904, line 27, to page 4905, line 6, should be deemed not to form a basis of our conclusion that there was a transfer or obligation within the time specified by 11 U.S.C. § 107(d). Since our opinion concluded that there were other bases for finding such a transfer or obligation, however, our ultimate conclusion on the timing issue is unchanged.
 
 
 71
 Second, there is a question with respect to the application of assets to the debts of Propper. Immediately before discussing the merits of the various claims, the district judge stated that USN and UMO were seeking to "recover the amounts applied to the debts of National, TWO, and Propper." (At 453.) Later in his opinion, however, Judge Pollack stated in a footnote that USN and UMO are not asserting "any claim to the UMO assets applied to the debts of Propper." (At 455 n.14.) Our opinion assumed, perhaps incorrectly, that the loan to Propper was at issue in the district court. Rather than resolve this question here, we think it preferable for Judge Pollack to clarify this ambiguity on remand and take appropriate action.
 
 
 
 [1]
 The Bankruptcy Act of 1898 has been superseded by the Bankruptcy Reform Act of 1978, Pub.L.No. 95-598, 92 Stat. 2549 (1978), which took effect on October 1, 1979, and is codified under the current Title 11 of the United States Code. The present litigation is governed by the old Bankruptcy Act because the action was commenced before the effective date of the new Act. All subsequent references to the "Bankruptcy Act" or "Act" pertain to the old Act, as codified under former Title 11 of the Code
 
 
 [2]
 The remainder of the stock of International was owned by Eugene Johnson, a sales manager of USN and UMO who is not involved in this litigation
 
 
 [3]
 Familiar sights in many big-city neighborhoods, these enterprises cash checks for a fee, sell money orders, and often perform other financial services for their customers, such as selling food stamps and acting as collection agents for local utilities
 
 
 [4]
 Sparago was subsequently disbarred for his participation in the commission of a fraud against the federal Small Business Administration. See note 5 infra
 
 
 [5]
 Empire's main source of capital was the receipt of loans from the federal Small Business Administration. In 1978, Trent, Skowron, and Sparago pleaded guilty to federal felony charges in connection with Empire's receipt of those loans
 
 
 [6]
 Trent and Skowron also had interests in various other firms, including an armored car company used to transport currency to and from the check cashers, that are not involved in this appeal and do not appear on the chart above
 
 
 [7]
 As the district court remarked, the importance of the float to USN and UMO can be seen in the precipitous collapse that followed the loss, in January 1977, of one day's float
 
 
 [8]
 As money order issuers, both USN and UMO were regulated to some degree by the banking authorities of the various states in which they operated. The California report was based on an informal examination of UMO's books, not on a formal audit
 
 
 [9]
 Apparently MHT knew that the California authorities were reviewing UMO's books, but was not aware of the conclusions drawn in the examiner's report, which was labeled "STRICTLY CONFIDENTIAL."
 
 
 [10]
 According to Philip Clyne, a MHT credit officer responsible for reviewing loans to check cashers, this final, and highly risky, loan was prompted by the picketing of MHT by employees of the National and TWO check cashers' subsidiaries and by the intervention of Mario Biaggi, a local Congressman
 
 
 [11]
 The record does not indicate whether or, if it was, how the remainder of the indebtedness of National and TWO was repaid
 
 
 [12]
 The trustees discontinued counts 3, 5, 7, and 9, which had been asserted against MHT, and the district court severed counts 1, 6, and 8, asserted against Trent and Skowron. Counts 2, 4, and 10 proceeded to trial. The district court ruled against the trustees on all counts. The dismissal of count 4, which concerned the ownership of a block of stock held in USN's name and seized by MHT under the guarantees, has not been appealed
 
 
 [13]
 The court did not rule on the insolvency issue with respect to USN. See Part II.C.2. infra
 
 
 [14]
 In addition, § 67(d)(2) required the trustees to prove the existence of creditors at the time when the obligations were incurred. MHT asserts that the trustees have failed to do so, reasoning that the one unredeemed UMO money order placed in evidence by the trustees was issued on January 7, 1977, after the disputed transactions occurred. This argument is baseless. The trustees showed that USN and UMO issued an average of 900,000 money orders per month. Holders of unredeemed money orders were obviously creditors of the firms. It strains reason to suppose that USN and UMO, whose business was based on the float created by unredeemed money orders, had no money orders outstanding in September or December of 1976
 
 
 [15]
 It will be remembered that the proceeds from the sale of USN and UMO money orders were commingled in a single bank account
 
 
 [16]
 Nor should the court have concluded that the money order issuers necessarily received fair consideration by virtue of the benefit to them of the loans made directly to UMO and its check casher sales agents, and of the guarantees of the debts of USN and UMO given by other Trent/Skowron affiliates. The loans to UMO were fully collateralized, and we may assume that UMO's giving of collateral to secure them was supported by fair consideration; but this does not mean that there was fair consideration for UMO's guarantee of the debts of other companies. The loans made to UMO's sales agent Propper may have facilitated remittances from Propper to UMO, but would only constitute fair consideration to UMO if the amount of money passing to it as a result of the loan was "not disproportionately small" in comparison with its obligation of repayment. Finally, while the various cross-guarantees of USN and UMO may have induced MHT to loan money to the check cashers, the crucial issues are whether any of that money found its way to USN and UMO and, if it did, whether its amount was "not disproportionately small" as compared to the issuers' respective obligations
 
 
 [17]
 Section 67(d)(1)(e) also requires that the consideration be given in good faith. The district court found that MHT acted in good faith. On the present record, we see no reason to disturb this finding
 
 
 [18]
 It appears, however, that Arthur Andersen's refusal to give a formal opinion as to UMO's financial condition was not based on doubt that UMO was insolvent; rather it reflected the fact that Arthur Andersen had found the books of UMO in such a state that even after employing 40-50 professionals in the audit for several thousand man-hours, it could not prepare an opinion as to UMO's financial position in accordance with generally accepted accounting principles. In light of the auditors' uncertainty concerning the accuracy of UMO's books, not mentioned by the district court in concluding that UMO's "books ... showed a positive net worth at all relevant times," it may be appropriate for the district court on remand to make a more thorough analysis and appraisal of the testimony of Waters, Trent, and Sparago regarding the financial condition of UMO