48 F.3d 623
 31 Fed.R.Serv.3d 1422
 HBE LEASING CORPORATION, Signal Capital Corporation, John
Hancock Corporation, Petitioners-Appellees-Cross-Appellants,
v.
Clemence FRANK, Respondent-Appellant,
and
Gerald Lefcourt, Jay Goldberg, Michael Berger, Judd
Burstein, Goldstein & Stoloff, Richard Ware Levitt
and Cliff Gordon, Respondents-Cross-Appellees.
 Nos. 184, 564, Dockets 93-9263L, 94-7185XAP.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 13, 1994.
Decided Jan. 18, 1995.
As Amended on Denial of Rehearing March 13, 1995.
 
 Edward Rubin, New York City, for respondent-appellant.
 S. Pitkin Marshall, New York City, for petitioners-appellees-cross-appellants.
 Sheryl E. Reich, New York City (Gerald B. Lefcourt, Lefcourt & Dratel, on the brief), for respondents-cross-appellees Gerald Lefcourt, Jay Goldberg, Judd Burstein, Richard Ware Levitt, and Cliff Gordon.
 Michael G. Berger, pro se.
 Before: NEWMAN, Chief Judge, WALKER and CALABRESI, Circuit Judges.
 JON O. NEWMAN, Chief Judge:
 
 
 1
 This appeal concerns the application of fraudulent conveyance law to multi-party transactions involving an insolvent judgment debtor. In one set of transactions, the debtor exchanged mortgages for funds and immediately transferred the funds to a third party. In another set of transactions, the debtor paid the attorney's fees of its co-defendants in a civil action. The primary question in both circumstances is whether the debtor received fair consideration for its property.
 
 
 2
 Clemence Frank ("Clemence") appeals from an order of the District Court for the Southern District of New York (Gerard L. Goettel, Judge) voiding two mortgages that she held in real property owned by judgment debtor H.H. Frank Enterprises, Inc. ("Enterprises"). The appellees, judgment creditors of Enterprises who were petitioners in the District Court ("Petitioners"), cross-appeal from the District Court's order insofar as it dismissed their claims against a group of attorneys who allegedly received fraudulent conveyances from Enterprises ("the Attorneys"). We affirm the avoidance of one of Clemence's mortgages on the ground that she knew or should have known that it was part of a single transaction from which Enterprises received no benefit. However, we reverse the avoidance of her other mortgage and remand for further proceedings, because Enterprises may have used the proceeds from that mortgage for legitimate corporate purposes. On the cross-appeal, we reverse and remand the dismissal of Petitioners' claims against the Attorneys, because although the District Court properly found that Enterprises received fair consideration for these payments, it failed to consider Petitioners' alternative theory that the payments were made with actual fraudulent intent.
 
 Background
 
 3
 Petitioners in this proceeding to set aside fraudulent conveyances represent a group of leasing companies and their assigns who were prevailing plaintiffs in a civil RICO fraud action tried before Judge Goettel and a jury. The defendants in the RICO action were: eight individuals, including Hiram H. Frank and Hiram J. Frank, who are the husband and son, respectively, of appellant Clemence Frank; three corporations, including Enterprises, in which Hiram J. Frank owns a majority interest; and H.H. Frank Enterprises, Inc. Pension Plan ("the Pension Plan"). After a jury trial, the District Court entered judgment for the plaintiffs for trebled RICO damages of $19,670,142 plus interest, for which the defendants are jointly and severally liable; for common law fraud damages against various defendants totaling $6,556,714; and for punitive damages totaling $5,000,000. That judgment was affirmed on a prior appeal. HBE Leasing Corp. v. Frank, 22 F.3d 41 (2d Cir.1994).
 
 
 4
 With the judgment largely unsatisfied, Petitioners commenced this supplementary proceeding in aid of judgment, pursuant to Fed.R.Civ.P. 69(a) and N.Y.C.P.L.R. Sec. 5225(b) (McKinney 1978), to void certain transfers from Enterprises to Clemence and to the Attorneys as fraudulent conveyances under New York law. Neither Clemence nor the Attorneys were defendants in the underlying RICO action.[1]
 
 
 5
 The contested transfers to Clemence consist of two mortgages on real property owned by Enterprises. These mortgages secured notes for $250,000 and $100,000, respectively, which Clemence received from Enterprises when she advanced those same amounts to the corporation. At the time of these mortgage transactions in 1992, Enterprises was a defendant in the RICO action, but no judgment had yet been entered. Clemence was not at that time an officer, director, or shareholder of Enterprises, although she had been a director until at least mid-1990. Petitioners do not deny that Clemence advanced a total of $350,000 at the time the mortgages were created, nor do they dispute in this action that the money she advanced derived from her own separate funds. Rather, their claim that the mortgages represented fraudulent conveyances stems from the fact that shortly after Enterprises received the $250,000 loan from Clemence, Enterprises disbursed these funds to her son, Hiram J. Frank, purportedly as repayment for loans he had earlier made to Enterprises. Similarly, shortly after Enterprises received the $100,000 loan from Clemence, the corporation disbursed approximately $60,000 of these monies to the Attorneys.
 
 
 6
 The total of the contested conveyances to the Attorneys comprised Enterprises' payment of $775,722 in fees for legal services allegedly rendered not to Enterprises itself, but to its co-defendants for what Enterprises contends was part of a unified legal defense in the RICO action. This sum does not include an additional $344,000 in fees that Enterprises paid to its own attorneys or $741,000 that the Pension Plan paid to various attorneys.
 
 
 7
 In an opinion, the District Court accepted three separate grounds for voiding Clemence Frank's mortgages. HBE Leasing Corp. v. Frank, 837 F.Supp. 57 (S.D.N.Y.1993). First, relying on the "Deep Rock" doctrine of equitable subordination, see Taylor v. Standard Gas & Electric Co., 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (1939) ("Deep Rock "), it found that Clemence was an "insider" whose loans represented capital contributions to Enterprises, regardless of whether the proceeds were used for legitimate corporate purposes, and that the mortgages should therefore be equitably subordinated to the claims of Petitioners. HBE Leasing, 837 F.Supp. at 60-61. Second, the Court found that Clemence had received the mortgages as part of a single transaction in which the mortgage proceeds were improperly transferred to her son, Hiram J. Frank. Because Enterprises itself received no benefit from the completed transaction, the District Court found the transfer of the mortgages to Clemence to be fraudulent, regardless of whether she knew of the entire transaction. Id. at 61. Third, the Court found that Clemence had not taken the mortgages in good faith. Id. at 62.
 
 
 8
 The District Court also found that Enterprises' payments to the Attorneys were not fraudulent transfers, because Enterprises realized a benefit from the Attorneys' representation of its co-defendants as part of a joint defense in the RICO action. Id. at 63. The Court also reasoned that it would place too great a burden on trial lawyers if they had to inquire into the financial resources of their clients before they accepted payment of legal fees. Id. at 63-64.
 
 
 9
 Finally, in an unpublished order the District Court determined that further discovery and a hearing would be necessary to resolve a separate claim against Clemence relating to a transfer from her husband, Hiram H. Frank. Accordingly, the District Court severed this claim for further proceedings.
 
 Discussion
 A. Appellate Jurisdiction
 
 10
 We must initially consider the question of our appellate jurisdiction, which arises because this supplementary proceeding involves multiple claims, not all of which have been adjudicated.[2] On November 2, 1993, the District Court entered its order and opinion adjudicating Petitioners' claims pertaining to Clemence's mortgages and Enterprises' payments to the Attorneys. Subsequently, on December 17, 1993, the District Judge denied a motion by Clemence to stay the November 2 order as it related to her mortgages. The Judge reasoned that a stay would needlessly delay the sale of valuable properties, and that if Clemence succeeded in having the order overturned on appeal, any deficiency in the sale proceeds could be satisfied by the Petitioners, who were all solvent. Finally, on January 13, 1994, the District Court entered a document called a "judgment" (signed on December 15, 1993), which purported to dispose of the two previously decided claims, and which severed for further proceedings a third claim relating to a transfer to Clemence from her husband, Hiram H. Frank. Neither this "judgment" nor any order contained an express determination that there was no just reason for delay. The judgment, however, ordered Clemence "to execute and file all documents necessary and appropriate to vacate and remove any mortgage lien she may have asserted against the property of HH Frank Enterprises, Inc. as to the aforesaid mortgages."
 
 
 11
 The parties contend that we have jurisdiction over this appeal pursuant to 28 U.S.C. Sec. 1291 (1988), which grants us jurisdiction when the District Court has entered a final judgment. Rule 54(b) of the Federal Rules of Civil Procedure sets out the requirements for the entry of a partial final judgment in multi-claim or multi-party actions. A final judgment may be entered as to some--but fewer than all--claims or parties "only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." Fed.R.Civ.P. 54(b). The Rule makes clear that if the District Court does not both direct entry of judgment and expressly determine that there is no just reason for delay, then its order or decision is not final, whether or not it is labeled a "judgment."[3]
 
 
 12
 Once separate claims or claims against separate parties have been fully adjudicated, Rule 54(b) commits the decision to enter a judgment to the discretion of the District Court. See Curtiss-Wright Corp. v. General Electric Co., 446 U.S. 1, 8, 100 S.Ct. 1460, 1464-65, 64 L.Ed.2d 1 (1980); Ginett v. Computer Task Group, Inc., 962 F.2d 1085, 1092 (2d Cir.1992). But the exercise of this discretion must follow the procedures set out by the Rule, and the requirement of an express determination that there is no just reason for delay has not been taken lightly by this Circuit. We have found an abuse of discretion where entry of judgment has been accompanied by a mere repetition of the statutory language that "there is no just reason for delay," without any reasoned explanation for such determination. See, e.g., Harriscom Svenska AB v. Harris Corp., 947 F.2d 627, 629-30 (2d Cir.1991); Cullen v. Margiotta, 618 F.2d 226, 228 (2d Cir.1980). A fortiori, the entry of a "judgment" unaccompanied even by the statutory formula is not a sufficient basis for our jurisdiction. In re Chateaugay Corp., 928 F.2d 63, 64 (2d Cir.1991).
 
 
 13
 In the instant case, the District Court did not expressly determine that there was no just reason for delay in entering judgment. Contrary to the contention of the parties, the explanation given by the District Court for denying Clemence's motion for a stay does not supply the missing express determination, because there is simply no evidence that the District Court intended its ruling on the stay to constitute a Rule 54(b) certification. The requirement of an express determination cannot be met if the District Court does not make clear that such determination is for the purpose of certifying a final judgment (e.g., by labeling its order a "Rule 54(b) Certification"). Because there was no Rule 54(b) certification, the District Court's order remains interlocutory.[4]
 
 
 14
 However, an immediate appeal may be taken from an interlocutory order granting an injunction. See 28 U.S.C. Sec. 1292(a)(1) (1988). An order has the practical effect of granting injunctive relief within the meaning of section 1292(a)(1) if it is " 'directed to a party, enforceable by contempt, and designed to accord or protect some or all of the substantive relief sought by a complaint,' " Abish v. Northwestern National Insurance Co., 924 F.2d 448, 453 (2d Cir.1991) (quoting Korea Shipping Corp. v. New York Shipping Ass'n, 811 F.2d 124, 126 (2d Cir.1987)), and if the appealing party demonstrates " ' "serious, perhaps irreparable, consequences," ' " id. (quoting Korea Shipping, 811 F.2d at 126 (quoting Carson v. American Brands, Inc., 450 U.S. 79, 84, 101 S.Ct. 993, 996, 67 L.Ed.2d 59 (1981))).[5]
 
 
 15
 The District Court's order granted injunctive relief against Clemence insofar as it directed her to remove any liens she may have asserted on the property that is subject to her mortgages. Unlike the provisional remedies of attachment and replevin, which do not constitute injunctions for the purpose of section 1292(a)(1), see 16 Charles A. Wright et al., Federal Practice and Procedure Sec. 3922, at 43 (1977), the District Court's order is directed to a party, and it is presumably enforceable, if necessary, by contempt. The order is also plainly designed to accord the substantive relief sought by Petitioners. Finally, it threatens Clemence with irreparable harm, because it contemplates the immediate delivery and sale of the mortgaged property but does not require a bond or other security from Petitioners. In these respects, the order is far more than a simple adjudication of liability or a declaration of property rights, and it is accordingly subject to interlocutory appeal under section 1292(a)(1).[6]
 
 
 16
 Although the District Court's injunctive order is interlocutory, in the sense that another claim remains to be adjudicated, the District Court has fully adjudicated Petitioners' claim for injunctive relief, and the merits relating to Clemence's mortgages are therefore before us in precisely the same manner as they would be on appeal from a final judgment. See 16 Wright, supra, Sec. 3921, at 21-22. We also find that this is an appropriate case in which to exercise our discretion to assert pendent appellate jurisdiction over Petitioners' cross-appeal, see, e.g., Golino v. City of New Haven, 950 F.2d 864, 868-69 (2d Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 3032, 120 L.Ed.2d 902 (1992); San Filippo v. United States Trust Co. of New York, 737 F.2d 246, 255 (2d Cir.1984), cert. denied, 470 U.S. 1035, 105 S.Ct. 1408, 84 L.Ed.2d 797 (1985), because determining whether Clemence's second mortgage represents a fraudulent conveyance depends in part on the merits of Petitioners' claim against the Attorneys.
 
 B. Standard of Review
 
 17
 In a special proceeding under New York C.P.L.R. Sec. 5225(b),[7] applicable in the District Court via Fed.R.Civ.P. 69(a), a court may grant summary relief where there are no questions of fact, but "it must conduct a trial on disputed issues of fact on adverse claims in a turnover matter," General Motors Acceptance Corp. v. Norstar Bank of Hudson Valley, 156 A.D.2d 876, 549 N.Y.S.2d 862, 863 (1989); see also Port of New York Authority v. 62 Cortlandt Street Realty Co., 18 N.Y.2d 250, 273 N.Y.S.2d 337, 340, 219 N.E.2d 797, 799 (1966) (summary judgment standard applies to special proceedings), cert. denied, 385 U.S. 1006, 87 S.Ct. 712, 17 L.Ed.2d 544 (1987). The District Court implicitly treated the parties' submissions as motions for summary judgment: finding that no material facts were in dispute, it entered judgment without a trial on the basis of the affidavits and appended exhibits. We therefore review its decision de novo.
 
 C. Substantive Fraudulent Conveyance Law
 
 18
 Petitioners contend that the transfers to Clemence Frank and the Attorneys were fraudulent under the New York Uniform Fraudulent Conveyance Act ("UFCA"), N.Y.Debt. & Cred.Law ("DCL") Secs. 270-281 (McKinney 1990). The UFCA identifies several situations involving "constructive fraud," in which a transfer made without fair consideration constitutes a fraudulent conveyance, regardless of the intent of the transferor. One situation involving constructive fraud is identified by DCL Sec. 273-a:
 
 
 19
 Every conveyance made without fair consideration when the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him, is fraudulent as to the plaintiff in that action without regard to the actual intent of the defendant if, after final judgment for the plaintiff, the defendant fails to satisfy the judgment.
 
 
 20
 In this case, Enterprises made the contested transfers after it became a defendant in Petitioners' RICO action, and Enterprises has now failed to satisfy the final judgment in that action. Thus, the transfers are fraudulent under section 273-a unless they were made for "fair consideration," which is defined by DCL Sec. 272:
 
 
 21
 Fair consideration is given for property, or obligation,
 
 
 22
 a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or
 
 
 23
 b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.
 
 
 24
 Even where fair consideration is given in exchange for the debtor's property, a transfer may be fraudulent under the UFCA if it is marked by "actual fraud," that is, if it is made "with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors," DCL Sec. 276.
 
 1. Clemence Frank's Mortgages
 
 25
 Clemence received her mortgages from Enterprises as security for contemporaneous advances to the corporation of $350,000 of her own funds. On the surface, then, Clemence appears to have given fair consideration for the mortgages, because they secured present advances of the same value. See DCL Sec. 272(b). Nevertheless, the District Court ruled on three somewhat related grounds that the mortgages should be voided under the constructive fraud provisions of DCL Sec. 273-a. We consider each of these grounds in turn, and then apply the resulting legal principles to the mortgage transactions.
 
 
 26
 a. Equitable subordination. Of the three grounds, it will be convenient to consider first the District Court's view that the mortgages could be voided under the doctrine of equitable subordination, without regard to the ultimate fate of the funds Clemence advanced. This conclusion was based on a finding that Clemence was an "insider" of Enterprises whose cash advances were deemed to be capital contributions rather than loans. The doctrine of equitable subordination, however, simply does not apply to state-law fraudulent conveyance claims. Equitable subordination is distinctly a power of federal bankruptcy courts, as courts of equity, to subordinate the claims of one creditor to those of others. See generally Scott M. Browning, Note, No Fault Equitable Subordination, 34 Wm. & Mary L.Rev. 487 (1993); Helen D. Chaitman, The Equitable Subordination of Bank Claims, 39 Bus.Law. 1561 (1984). This broad equitable power to disallow and reorder claims, first announced in bankruptcy case law, see Deep Rock, supra; Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), and now codified in the Bankruptcy Code at 11 U.S.C. Sec. 510(c) (1988), derives from the Bankruptcy Court's role as administrator of the debtor's estate for the equal benefit of all creditors, see, e.g., Pepper, 308 U.S. at 303-05, 60 S.Ct. at 243-45.
 
 
 27
 Unlike the Bankruptcy Code, the UFCA is a set of legal rather than equitable doctrines, whose purpose is not to provide equal distribution of a debtor's estate among creditors, but to aid specific creditors who have been defrauded by the transfer of a debtor's property. See Boston Trading Group, Inc. v. Burnazos, 835 F.2d 1504, 1508 (1st Cir.1987).[8] Thus, the UFCA does not bestow a broad power to reorder creditor claims or to invalidate transfers that were made for fair consideration, at least where no actual intent to hinder, delay, or defraud creditors has been shown. As the definition of "fair consideration" in DCL Sec. 272 makes clear, even the preferential repayment of pre-existing debts to some creditors does not constitute a fraudulent conveyance, whether or not it prejudices other creditors, because "[t]he basic object of fraudulent conveyance law is to see that the debtor uses his limited assets to satisfy some of his creditors; it normally does not try to choose among them." Boston Trading, 835 F.2d at 1509; see also Atlanta Shipping Corp. v. Chemical Bank, 818 F.2d 240, 249 (2d Cir.1987); Ronga v. Chiusano, 97 A.D.2d 753, 468 N.Y.S.2d 174, 175 (1983); 1 Garrard Glenn, Fraudulent Conveyances and Preferences Sec. 289, at 488-90 (1940).
 
 
 28
 New York courts have carved out one exception to the rule that preferential payments of pre-existing obligations are not fraudulent conveyances: preferences to a debtor corporation's shareholders, officers, or directors are deemed not to be transfers for fair consideration. See Farm Stores, Inc. v. School Feeding Corp., 102 A.D.2d 249, 477 N.Y.S.2d 374, 378 (1984), aff'd, 64 N.Y.2d 1065, 489 N.Y.S.2d 877, 479 N.E.2d 222 (1985); Southern Industries, Inc. v. Jeremias, 66 A.D.2d 178, 411 N.Y.S.2d 945, 949 (1978). This exception is indirectly relevant to Clemence's mortgages, because Enterprises used the proceeds from one of them to pay off antecedent debts to its principal shareholder, Hiram J. Frank; under Farm Stores, these preferential payments to a controlling shareholder would be fraudulent conveyances. But the Farm Stores preference exception cannot be applied directly to Clemence's mortgages, regardless of whether she was a corporate insider, because each of her mortgages secured a contemporaneous advance of funds, not a pre-existing debt. Unlike the preferential payment of pre-existing debts, the transfer of a debtor's property to secure a present advance of commensurate value does not ordinarily prejudice other creditors, because the debtor receives new value in exchange for the property conveyed.
 
 
 29
 In sum, Clemence Frank's mortgages may not be directly invalidated either under the doctrine of equitable subordination or as preferences to a corporate insider. If analyzed without regard to the ultimate fate of the funds she advanced, these mortgages could not be found to be fraudulently conveyed. They might be fraudulent, however, if analyzed as part of a larger transaction. This view underlies the District Court's second basis for voiding the mortgages, to which we now turn.
 
 
 30
 b. "Collapsing" the transactions. It is well established that multilateral transactions may under appropriate circumstances be "collapsed" and treated as phases of a single transaction for analysis under the UFCA. See, e.g., Orr v. Kinderhill Corp., 991 F.2d 31, 35-36 (2d Cir.1993). This approach finds its most frequent application to lenders who have financed leveraged buyouts of companies that subsequently become insolvent. See United States v. Gleneagles Investment Co., 565 F.Supp. 556 (M.D.Pa.1983) (Pennsylvania UFCA), aff'd sub nom. United States v. Tabor Court Realty Corp., 803 F.2d 1288 (3d Cir.1986), cert. denied, 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987); Crowthers McCall Pattern, Inc. v. Lewis, 129 B.R. 992, 998 (S.D.N.Y.1991) (New York UFCA); Wieboldt Stores, Inc. v. Schottenstein, 94 B.R. 488, 500-04 (N.D.Ill.1988) (Illinois UFCA); In re Best Products Co., 168 B.R. 35, 56-57 (Bankr.S.D.N.Y.1994) (New York UFCA). The paradigmatic scheme is similar to that alleged here: one transferee gives fair value to the debtor in exchange for the debtor's property, and the debtor then gratuitously transfers the proceeds of the first exchange to a second transferee. The first transferee thereby receives the debtor's property, and the second transferee receives the consideration, while the debtor retains nothing.
 
 
 31
 Under these circumstances, the initial transfer of the debtor's property to the first transferee is constructively fraudulent if two conditions are satisfied. First, in accordance with the foregoing paradigm, the consideration received from the first transferee must be reconveyed by the debtor for less than fair consideration or with an actual intent to defraud creditors. If, instead, the debtor retains the proceeds from the first exchange, reconveys them for fair consideration, or uses them for some other legitimate purpose, including the preferential repayment of pre-existing debts, and if the debtor does not make the subsequent transfer with actual fraudulent intent, then the entire transaction, even if "collapsed," cannot be a fraudulent conveyance, because it does not adversely affect the debtor's ability to meet its overall obligations. See Atlanta Shipping, 818 F.2d at 249; see also 1 Glenn, supra, Sec. 275, at 471 ("[W]here a transfer for value ... is put forward as a fraudulent conveyance, the test is whether, as a result of the transaction, the debtor's estate was unfairly diminished.").
 
 
 32
 Second, and contrary to the approach taken by the District Court, the transferee in the leg of the transaction sought to be voided must have actual or constructive knowledge of the entire scheme that renders her exchange with the debtor fraudulent. See Kupetz v. Wolf, 845 F.2d 842, 847-49 (9th Cir.1988); Atlanta Shipping Corp., 818 F.2d at 249; Tabor Court, 803 F.2d at 1296; Crowthers McCall, 129 B.R. at 998; Wieboldt Stores, 94 B.R. at 502-03. The case law has been aptly summarized in the following terms:
 
 
 33
 In deciding whether to collapse the transaction and impose liability on particular defendants, the courts have looked frequently to the knowledge of the defendants of the structure of the entire transaction and to whether its components were part of a single scheme.
 
 
 34
 In re Best Products, 168 B.R. at 56-57 (quoting In re Best Products Co., 157 B.R. 222, 229 (Bankr.S.D.N.Y. (1993)). The existence of a knowledge requirement reflects the UFCA's policy of protecting innocent creditors or purchasers for value who have received the debtor's property without awareness of any fraudulent scheme. Thus, an appropriate creditor may void or disregard a fraudulent conveyance to any person "except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase." DCL Sec. 278(1); see also FDIC v. Malin, 802 F.2d 12, 19 (2d Cir.1986); Farm Stores, 477 N.Y.S.2d at 379.
 
 
 35
 However, the transferee need not have actual knowledge of the scheme that renders the conveyance fraudulent. Constructive knowledge of fraudulent schemes will be attributed to transferees who were aware of circumstances that should have led them to inquire further into the circumstances of the transaction, but who failed to make such inquiry. See, e.g., Tabor Court, 803 F.2d at 1295 (lenders "knew, or should have known" that monies would not be retained by debtor). There is some ambiguity as to the precise test for constructive knowledge in this context. While some cases have stated that purchasers who do not make appropriate inquiries are charged with "the knowledge that ordinary diligence would have elicited," United States v. Orozco-Prada, 636 F.Supp. 1537, 1543 (S.D.N.Y.1986), aff'd, 847 F.2d 836 (2d Cir.1988); see also Morse v. Howard Park Corp., 50 Misc.2d 834, 272 N.Y.S.2d 16, 22 (Sup.Ct.1966), others appear to have required a more active avoidance of the truth, see Schmitt v. Morgan, 98 A.D.2d 934, 471 N.Y.S.2d 365, 367 (1983) (test is whether subsequent purchaser who did not make serious inquiry "was shielding himself from knowledge that a fraudulent conveyance had occurred"); 1 Glenn, supra, Sec. 304, at 532 (transferee may be charged with knowledge only when there is "conscious turning way from the subject").[9]
 
 
 36
 c. Lack of good faith. The District Court bolstered its view that the mortgage transactions could be collapsed by deeming Clemence not to have acted in good faith. Petitioners attempt to assert lack of good faith as a ground for voiding the mortgages independent of the role that mental state plays in the analysis whereby the transactions are collapsed. This use of bad faith as an independent ground cannot be sustained. Though some New York cases have broadly construed the reference to "good faith" in DCL Sec. 272's definition of "fair consideration," see, e.g., Southern Industries, 411 N.Y.S.2d at 949 (voiding preferences to corporate insiders), other authorities have cautioned against an expansive reading of the UFCA's reference to good faith, see, e.g., Boston Trading Group, 835 F.2d at 1512-13. We believe that where, as here, a transferee has given equivalent value in exchange for the debtor's property, the statutory requirement of "good faith" is satisfied if the transferee acted without either actual or constructive knowledge of any fraudulent scheme. See Atlanta Shipping, 818 F.2d at 249; 1 Glenn, supra, Sec. 295, at 512 (UFCA requirement of "good faith" refers solely to "whether the grantee knew, or should have known, that he was not trading normally, but that ... the purpose of the trade, so far as the debtor was concerned, was the defrauding of his creditors").
 
 
 37
 d. Application of legal principles. In the application of this framework to Clemence Frank's mortgages, the initial question is whether Enterprises received fair consideration from the entire multilateral transaction surrounding each mortgage. With regard to the first mortgage, the $250,000 that Clemence advanced to Enterprises was immediately passed on to the company's majority shareholder, Hiram J. Frank, as a preference to a corporate insider. Because this preferential payment in the second stage of the transaction was a fraudulent conveyance under the holding of Farm Stores, supra, the net result was that Clemence received a mortgage from Enterprises while Hiram J. Frank received money from Clemence. Thus, at the end of the day Enterprises itself received nothing in exchange for the first mortgage.[10]
 
 
 38
 With regard to the second mortgage, approximately $60,000 of the money that Clemence advanced went to the Attorneys to pay for legal services, while the remaining $40,000 was used for other corporate purposes. If both of these payments were legitimate corporate expenditures, then the second mortgage and the subsequent payments would not be fraudulent transfers even when viewed as a single scheme. Although the District Court found that the payments to the Attorneys were legitimate corporate expenditures, it voided the second mortgage in its entirety. This was error in two respects. First, since Petitioners have not even alleged facts that would render improper the portion of the proceeds not paid to the Attorneys, the transaction is not fraudulent, at least as it pertains to this much of the second mortgage. Second, we must remand the District Court's order as it pertains to the portion of the mortgage proceeds used to pay the Attorneys, because, as we conclude below, there is a genuine factual dispute as to whether these payments to the Attorneys were fraudulent transfers.
 
 
 39
 The second stage of the inquiry as to whether the transactions may be collapsed concerns Clemence's knowledge. Clemence was a director of Enterprises at least until the middle of 1990, if not longer. While she was a director, the corporation was frequently used by Hiram J. Frank as a conduit for various payments for family and other noncorporate purposes, and Clemence's fiduciary role charged her with constructive knowledge of these basic aspects of the company's financial affairs, see Hanson Trust PLC v. ML SCM Acquisition Inc., 781 F.2d 264, 274-75 (2d Cir.1986). In addition, Clemence concedes that she knew that Enterprises was a defendant in a RICO fraud action. She also concedes that she knew that her son, Hiram J. Frank, had made "large loans" to Enterprises, which put her on notice that he might cause the company to make preferential payments to himself with the proceeds from the mortgages. This information should have been sufficient to alert Clemence to the danger that Enterprises might improperly funnel to third parties the money she was advancing, and she should have made reasonably diligent inquiries into the use of the mortgage proceeds. Under the circumstances, her failure to inquire represented a conscious turning away from the subject. Thus, with regard to both mortgages, the undisputed facts are sufficient to charge Clemence with constructive knowledge of schemes in which her cash advances were expended by Enterprises for improper purposes.
 
 2. Payments to the Attorneys
 
 40
 Petitioners also contend that Enterprises fraudulently conveyed $775,722 in legal fees to the Attorneys, approximately $60,000 of which derived from the proceeds of Clemence's second mortgage. The contested fees represented payment for legal services that the Attorneys rendered as counsel for Enterprises' co-defendants in the RICO action. Petitioners argue that the Attorneys' legal services were not "fair consideration" within the meaning of DCL Sec. 272 because they were not provided directly to Enterprises itself. The Attorneys respond that their services were "fair consideration" for Enterprises' payments because Enterprises benefitted from the unified defense of which these services were a part.
 
 
 41
 The District Court agreed with the Attorneys. It found that it was to the advantage of each defendant in the RICO action to present a unified defense and to have all co-defendants adequately represented, because all the defendants were threatened with joint and several liability. The District Court reasoned:
 
 
 42
 One can question the wisdom of retaining some of the attorneys, a number of whom were prominent, expensive New York City criminal lawyers. However, the selection of the proper counsel is always a matter of individual choice. The plaintiffs have never disputed that bona fide legal services were rendered by the attorneys to one or more of the defendants or that their disbursements were not actually incurred.
 
 
 43
 Having presided at the very lengthy trial and considered the numerous motions, we conclude ... that in a conspiracy case such as this, Enterprises did receive a benefit from the funds it laid out on behalf of the other parties, albeit it paid far too high a price for that benefit. Nor do we believe that there was anything unethical in this approach in light of the common interest of all of the defendants and their right to have a joint defense if it was to their benefit.
 
 
 44
 HBE Leasing, 837 F.Supp. at 63 (footnotes omitted). The District Court therefore concluded that the benefit Enterprises received from the Attorneys' services represented fair consideration for Enterprises' payments, and it accordingly dismissed Petitioners' claim against the Attorneys.
 
 
 45
 In determining whether Enterprises received fair consideration, the District Court correctly disregarded the form of this transaction and looked instead to its substance. Under DCL Sec. 272, "fair consideration" means a fair equivalent that the debtor receives in exchange for its property or obligation. Thus, when a debtor transfers its property but the transferee gives the consideration to a third party, the debtor ordinarily will not have received fair consideration in exchange for its property. However, under the well established doctrine of Rubin v. Manufacturers Hanover Trust Co., 661 F.2d 979 (2d Cir.1981), the fact that the consideration initially goes to third parties may be disregarded to the extent that the debtor indirectly receives a benefit from the entire transaction. See id. at 991-92; see also In re Fairchild Aircraft Corp., 6 F.3d 1119, 1127 (5th Cir.1993); In re Jeffrey Bigelow Design Group, Inc., 956 F.2d 479, 485 (4th Cir.1992); Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635, 646-47 (3d Cir.1991), cert. denied, 503 U.S. 937, 112 S.Ct. 1476, 117 L.Ed.2d 620 (1992); In re W.T. Grant Co., 699 F.2d 599, 609 (2d Cir.), cert. denied, 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983). While Rubin has most often been applied in cases decided under the fraudulent conveyance provisions of federal bankruptcy law, its approach to indirect benefits is equally applicable under the parallel provisions of the UFCA. See Telefast, Inc. v. VU-TV, Inc., 591 F.Supp. 1368, 1379-81 (D.N.J.1984) (New Jersey UFCA); In re Chomakos, 170 B.R. 585, 590 (Bankr.E.D.Mich.1993) (Michigan UFCA).
 
 
 46
 Petitioners contend that the District Court's finding that Enterprises indirectly received "a benefit" from the Attorneys' services does not satisfy Rubin 's test for fair consideration. Under the UFCA and the parallel provisions of federal bankruptcy law, "fair consideration" is defined quantitatively as "a fair equivalent" or an "amount not disproportionately small as compared with the value of the property, or obligation obtained [from the debtor]." DCL Sec. 272; see also 11 U.S.C. Sec. 548(a)(2)(A) (1988). Thus, to determine whether a debtor indirectly received fair consideration under the Rubin doctrine, the fact-finder must first attempt to measure the economic benefit that the debtor indirectly received from the entire transaction, and then compare that benefit to the value of the property the debtor transferred. Rubin, 661 F.2d at 993. The mere fact that the debtor received a benefit is therefore insufficient to find fair consideration. Id.
 
 
 47
 Despite the considerable force of Petitioners' argument, we believe that the quantitative analysis normally required by Rubin is inappropriate in this case where multiple co-defendants were threatened with joint and several liability, they mounted a common defense, and one defendant paid the legal fees of the others. As the District Court correctly noted, individual defendants may choose to pay as much to their attorneys for their defense as they consider worthwhile, as long as the payments fall within a fair range of reasonable compensation for bona fide legal services or are reimbursement for legitimate expenses incurred during the defense.[11] The same should be true of the defendants in this case who were threatened with joint and several liability and conducted a common defense to protect their common interests. The existence of some adverse interests among the co-defendants might reasonably have required each defendant to have individual counsel, but to the extent that the several defense attorneys conducted a joint defense, they effectively advanced the interests of all defendants simultaneously. See United States v. Schwimmer, 892 F.2d 237, 243-44 (2d Cir.1989) (recognizing joint defense privilege), cert. denied, 502 U.S. 810, 112 S.Ct. 55, 116 L.Ed.2d 31 (1991). Thus, the services that each defense attorney performed in the course of conducting a joint defense provided a benefit to each defendant. Rubin 's quantitative approach, requiring some measurement of the value of the benefit to each defendant, is not applicable under these circumstances because the full value of the joint defense inured to the benefit of all defendants, and there is no point in trying to quantify the incremental value added by the joint defense beyond the value of individual representation. These joint services represented "fair consideration" for the payment of reasonable compensation, regardless of which defendant paid the bill. We need not decide whether some inquiry concerning apportionment would be warranted in a case where the defenses of all the defendants did not overlap to the extent that occurred in this case.
 
 
 48
 Because Petitioners do not dispute that Enterprises' payment of the Attorneys' fees represented a reasonable rate of compensation for bona fide legal services rendered to defendants with substantially overlapping defenses, the District Court correctly concluded that Enterprises received fair consideration in exchange for its payments. However, the District Court failed to consider an alternative theory of liability offered by Petitioners: that Enterprises paid the Attorneys' fees with actual intent to defraud its creditors. Under DCL Sec. 276, a transfer made with actual intent to hinder, delay, or defraud present or future creditors is fraudulent as to such creditors, regardless of whether the debtor receives fair consideration for its property. See United States v. McCombs, 30 F.3d 310, 327-28 (2d Cir.1994); ACLI Government Securities, Inc. v. Rhoades, 653 F.Supp. 1388, 1395 n. 32 (S.D.N.Y.1987), aff'd, 842 F.2d 1287 (2d Cir.1988). Actual fraudulent intent must be proven by clear and convincing evidence, but it may be inferred from the circumstances surrounding the transaction, including the relationship among the parties and the secrecy, haste, or unusualness of the transaction. See McCombs, 30 F.3d at 328. However, a transfer motivated by actual fraudulent intent may not be voided if a transferee who paid fair consideration did not have actual or constructive knowledge of such intent. Dunham v. Tabb, 27 Wash.App. 862, 621 P.2d 179, 182 (1980); DCL Sec. 278.
 
 
 49
 The record establishes the existence of genuine factual disputes pertaining both to Enterprises' intent in paying the Attorneys' fees and the Attorneys' knowledge of that intent. Enterprises paid the legal fees of its co-defendants at the direction of its controlling shareholder, Hiram J. Frank, who was thereby relieved of the burden of paying for his own defense. Even though Enterprises received fair consideration in exchange for its payments, this arrangement effectively transferred substantial assets from the corporation to Hiram J. Frank and the other co-defendants. Because a fact-finder might reasonably conclude that the purpose behind this arrangement was to hinder, delay, or defraud Enterprises' future judgment creditors, the District Court should not have dismissed Petitioners' claims against the Attorneys at this stage in the proceedings. We therefore reverse and remand for further proceedings on this issue.[12]
 
 
 50
 The result of this inquiry will also determine Clemence Frank's liability on her second mortgage. As discussed above, this mortgage represented a voidable fraudulent transfer of Enterprises' property only to the extent that the subsequent transfer of $60,000 of the mortgage proceeds to the Attorneys was itself a fraudulent conveyance.[13] At most, however, these interlocking transactions resulted in a single fraudulent transfer of Enterprises' property. If the Petitioners establish on remand that the transfer to the Attorneys was fraudulent, they may recover this property from Clemence or (if it is shown that the Attorneys had actual or constructive knowledge of the fraudulent scheme) from the Attorneys. See United States v. Red Stripe, Inc., 792 F.Supp. 1338, 1344 (E.D.N.Y.1992); DCL Sec. 278(1)(a). But an unjustified double recovery would result if Petitioners could void both the relevant portion of Clemence's second mortgage and the transfer of the proceeds to the Attorneys. Cf. In re Checkmate Stereo & Electronics, Ltd., 9 B.R. 585, 622 (Bankr.E.D.N.Y.1981) (allowing only single recovery by imposing joint and several liability on multiple transferees under New York UFCA and Bankruptcy Code), aff'd, 21 B.R. 402 (E.D.N.Y.1982); Robert J. White, Leveraged Buyouts & Fraudulent Conveyance Law Under the Bankruptcy Code, 1991 Ann.Surv.Am.L. 357, 410-11 (1992) (bankruptcy trustee may recover only once from multiple transferees in multilateral fraudulent conveyance). Thus, if Petitioners elect to void the relevant portion of the mortgage, any judgment against the Attorneys must be reduced by an equivalent amount. This election of remedies does not affect Petitioners' rights vis-a-vis Clemence's other mortgage or the other payments to the Attorneys.
 
 Conclusion
 
 51
 We affirm the order of the District Court as it pertains to Clemence Frank's mortgage securing her $250,000 note. We reverse the order as it pertains to Clemence Frank's other mortgage, securing her $100,000 note, and insofar as it dismisses Petitioners' claims against the Attorneys, and remand for further proceedings consistent with this opinion. No costs.
 
 
 
 [1]
 Petitioners also instituted a separate diversity proceeding in the District Court to void other alleged fraudulent conveyances by the judgment debtors, including other transfers to Clemence and some of the Attorneys. See HBE Leasing Corp. v. Frank, 851 F.Supp. 571 (S.D.N.Y.1994)
 
 
 [2]
 A Rule 69(a) proceeding in aid of judgment is treated as a separate action for purposes of determining whether the District Court's decision is "final." See King v. Ionization International, Inc., 825 F.2d 1180, 1184 (7th Cir.1987); 7 James W. Moore et al., Federal Practice p 69.05 (2d ed.); see also Fox v. Capital Co., 299 U.S. 105, 57 S.Ct. 57, 81 L.Ed. 67 (1936)
 
 
 [3]
 In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties
 Fed.R.Civ.P. 54(b) (emphasis added).
 
 
 [4]
 Clemence and Petitioners contend that even without a Rule 54(b) certification, the order voiding Clemence's mortgages is final under the doctrine of Forgay v. Conrad, 47 U.S. (6 How.) 201, 204, 12 L.Ed. 404 (1848). Under the Forgay doctrine, "an order is treated as final if it directs the immediate delivery of property and subjects the losing party to irreparable harm if appellate review is delayed." In re Martin-Trigona (Schlehan v. Olympic Worldwide Communications, Inc.), 763 F.2d 135, 138 (2d Cir.1985). Our cases cast considerable doubt on whether Forgay is still applicable in a multi-claim or multi-party action in the absence of a Rule 54(b) certification. See In re Chateaugay Corp., 922 F.2d 86, 91 (2d Cir.1990), cert. denied, 502 U.S. 1093, 112 S.Ct. 1167, 117 L.Ed.2d 413 (1992); Martin-Trigona, 763 F.2d at 139; Zwack v. Kraus Brothers & Co., 237 F.2d 255, 262 (2d Cir.1956). But see 15A Charles A. Wright et al., Federal Practice and Procedure Sec. 3910, at 327 (1992) (arguing that immediate appeal should be available under Forgay doctrine where Rule 54(b) has been deliberately ignored); cf. 6 Moore, supra, p 54.32, at 54-186 (stating that inapplicability of Forgay hardship rule in multi-claim case is "anomalous"). In this case it is unnecessary to consider the continued vitality of the Forgay doctrine in the multi-claim context, because an interlocutory appeal is available to Clemence pursuant to 28 U.S.C. Sec. 1292(a)(1), on the ground that the District Court's order grants an injunction. Cf. 9 Moore, supra, p 110.11, at 100-11 (suggesting that orders appealable under Forgay are more properly treated as injunctions)
 
 
 [5]
 Our cases have not made clear whether a showing of serious consequences is always required for an interlocutory appeal pursuant to section 1292(a)(1). See Volvo North America Corp. v. Men's International Professional Tennis Council, 839 F.2d 69, 75 (2d Cir.), cert. denied, 487 U.S. 1219, 108 S.Ct. 2872, 101 L.Ed.2d 908 (1988). Because the threat of irreparable injury is present here, we need not decide this issue
 
 
 [6]
 We note also that the order is effectively an injunction against suit in another court, because it requires Clemence to remove mortgage liens that she had sought to enforce through a receivership in state court. "An order that prohibits a party from pursuing litigation in another court is unquestionably an injunction for purposes of interlocutory appeal...." 16 Wright, supra, Sec. 3923, at 48; accord FDIC v. Geldermann, Inc., 975 F.2d 695, 967 (10th Cir.1992); Phillips v. Chas. Schreiner Bank, 894 F.2d 127, 130 (5th Cir.1990); Klein v. Adams & Peck, 436 F.2d 337, 339 (2d Cir.1971). But see Hershey Foods Corp. v. Hershey Creamery Co., 945 F.2d 1272, 1278-79 (3d Cir.1991) (order staying proceedings in another court is not injunction within meaning of section 1292(a)(1) if it does not relate to ultimate relief sought)
 
 
 [7]
 C.P.L.R. Sec. 5225(b) authorizes a special proceeding by judgment creditors against third parties to recover money or personal property in which a judgment debtor has an interest; it does not explicitly relate to interests in real property. Nevertheless, all of the parties appear to have assumed that section 5225(b) provides the procedural basis for this proceeding. In any event, since diversity jurisdiction exists, the District Court had jurisdiction to entertain what would otherwise have been a plenary action based on New York substantive law, and no aspect of our disposition turns on the technical availability of section 5225(b)
 
 
 [8]
 In order to promote a uniform national interpretation of the UFCA, both this Circuit and the courts of New York have encouraged recourse to the case law of other jurisdictions. See Atlanta Shipping Corp. v. Chemical Bank, 818 F.2d 240, 249 (2d Cir.1987); Southern Industries, Inc. v. Jeremias, 66 A.D.2d 178, 411 N.Y.S.2d 945, 949 (1978)
 
 
 [9]
 We note that the burden of proving knowledge is on the party seeking to void the transaction. See Gelbard v. Esses, 96 A.D.2d 573, 465 N.Y.S.2d 264, 268 (1983). In fact, even the burden of production shifts to the transferee only if the creditor asserts that the transferee paid inadequate consideration and evidence concerning such consideration is within control of the transferee. Id.; ACLI Government Securities Inc. v. Rhoades, 653 F.Supp. 1388, 1391 (S.D.N.Y.1987), aff'd, 842 F.2d 1287 (2d Cir.1988). Because there is no dispute about the nature of the consideration provided by Clemence, she has satisfied any burden of production she may have had. See United States v. McCombs, 30 F.3d 310, 323-26 (2d Cir.1994)
 
 
 [10]
 Clemence nonetheless argues that Petitioners were not prejudiced by this collapsed transaction, because Hiram J. Frank used the funds he received to remove a lien from another piece of property that can now be levied upon by Petitioners. In other words, the $250,000 is still available to Petitioners, even though it is in Hiram J. Frank's rather than Enterprises' possession. Though a transfer may not be challenged as fraudulent unless it prejudices the complaining creditor, see, e.g., Citizens & Southern National Bank v. Auer, 640 F.2d 837, 838 (6th Cir.1981) (Tennessee UFCA), prejudice is not eliminated in this case by the fact that Hiram J. Frank, to whom the mortgage proceeds were transferred, is jointly liable with Enterprises to the Petitioners
 A creditor is prejudiced, sufficiently to void a fraudulent transfer, when an asset in the hands of its debtor is converted into funds that find their way to another debtor of the creditor. The availability of an alternative collection opportunity does not eliminate prejudice in this context. Of course, the opportunity to void Clemence's mortgage and to collect from Hiram J. Frank would not permit any recovery in excess of Petitioners' judgment; no such excess recovery is alleged, and the judgment remains unsatisfied.
 
 
 [11]
 This conclusion follows directly from the definition of "fair consideration" in DCL Sec. 272: the legal services rendered by defense counsel represent a "fair equivalent" that the defendant receives in exchange for the legal fees he or she pays
 
 
 [12]
 Other material factual disputes raised by the parties may be considered on remand. However, after reviewing the record de novo, we conclude that there is no basis for the Attorneys' argument that Petitioners' claims are barred by the doctrines of waiver, laches, or equitable estoppel; the Petitioners are therefore entitled to summary judgment on these defenses
 
 
 [13]
 We ruled above that, under the facts of this case, Clemence's relationship to the affairs of Enterprises created a duty of inquiry as to its uses of her funds, and that her lack of inquiry charges her with constructive knowledge of how those funds were in fact expended. Therefore, whether the $60,000 portion of her second mortgage can be voided depends, on remand, only on establishment of the actual fraudulent intent of Enterprises with respect to the payments to the Attorneys