In re DUKE & BENEDICT, INC., Debtor.

David Kittay, as Trustee of Duke & Benedict, Inc., Plaintiff,

v.

Peter D. Leibowits Company, Inc., Centennial Golf Club of New York, LLC, and Benedict Dairy Farms, Defendants.

Bankruptcy No. 97 B 20207(ASH).

Adversary No. 9 B 2215(ASH).

United States Bankruptcy Court, S.D. New York.

Feb. 6, 2001.

Kittay, Gold & Gershfeld, P.C., By David R. Kittay, Esq., White Plains, NY, for the Chapter 7 Trustee.

Kaye, Scholer, Fierman, Hays & Handler, LLP, By Allan M. Pepper and Michael J. Crames, New York City, for Defendants Peter D. Leibowits Company, Inc. and Centennial Golf Club of New York, LLC.

Douglas J. Pick & Associates, By Douglas J. Pick, New York City, for Defendant Benedict Dairy Farms.

### DECISION GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ADLAI S. HARDIN, Jr., Bankruptcy Judge.

In this adversary proceeding, the Chapter 11 Trustee seeks payment on the full value of certain real property conveyed by the debtor. The defendant-transferees have moved for summary judgment, contending that the Trustee, by this action, seeks to appropriate for the debtor the value of improvements which the defendants had made on the land at the time of the conveyance.

The resolution of the motion for summary judgment turns on the question of "reasonably equivalent value" and "fair consideration"—the comparison of what the debtor gave with what the debtor received. This opinion focuses specifically on the "interest of the debtor" which was conveyed in the transaction. Under this analysis, as set forth below, the defendants' motion for summary judgment is granted.

#### Jurisdiction

This Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157(a) and 1334 and the Standing Order of Referral of Cases to Bankruptcy Judges of the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). This adversary proceeding is a "core" proceeding under 28 U.S.C. § 157(b)(2)(A) and (H) in that they are proceedings concerning the administration of the Debtors' estates and to determine, avoid and recover alleged fraudulent conveyances.

### Background [1]

In 1994 the Debtor, Duke & Benedict, Inc., and Benedict Dairy Farms (collectively "D & B") owned approximately 457 acres of undeveloped land in the Towns of Carmel and Southeast, in Putnam County, New York (the "Property").[2] In 1994, D & B began negotiating with the Peter D. Leibowits Company, Inc. and Centennial Golf Club of New York (collectively, "Leibowits"), to develop a golf course and residential housing on the Property.

### The 1994 Agreement

Pursuant to an agreement dated November 11, 1994 (the "1994 Agreement"), D & B entered into a joint venture with Leibowits. Under the 1994 Agreement, Leibowits would select 340 acres from the Property and within 48 months obtain the necessary government approvals for the construction of a 27–hole golf course. Leibowits would bear all costs in connection with obtaining the approvals. Within 30 days after Leibowits obtained the necessary approvals, D & B and Leibowits would conduct a "closing" at which D & B would convey title to the 340 acres (the "Golf Course Land") to a limited liability company (the "LLC") to be formed by D & B and Leibowits. D & B would retain the remainder of the Property (the "Excess Acreage"), on which it would develop housing adjacent to the Golf Course Land. Leibowits would develop the Golf Course Land and manage it on behalf of the LLC with all operating and development costs to be paid by Leibowits. The net operating income of the LLC would be distributed 25 percent to D & B and 75 percent to Leibowits. The 1994 Agreement further

provided: "The net proceeds of any sale of the [Golf Course Land] shall be distributed twenty-five percent (25%) to D & B and seventy-five percent (75%) to Leibowits."

In short, if Leibowits performed under the 1994 Agreement D & B would be obligated to convey clear title to the Golf Course Land to the LLC in exchange for a 25–percent interest in the LLC.

### Development of the Golf Course Land

Leibowits did perform under the 1994 Agreement. He retained the renowned designer Larry Nelson who drafted architectural drawings for the golf course.

Because the Golf Course Land was situated in the Putnam County towns of Carmel and Southeast, Leibowits needed site-plan approvals from each municipality. On May 11, 1995, Centennial submitted its site-plan applications, based on the Larry Nelson design, to the Carmel and Southeast planning boards. The applicant listed was "Centennial Golf Properties, Inc.," a corporation owned by Leibowits.

In March 1996, Leibowits obtained conditional site-plan approvals from the Town of Carmel and the Town of Southeast. The conditional approvals were specific to the applicant, which was listed as "Centennial Golf Properties, Inc." The conditional site-plan approvals imposed substantial conditions on Centennial Golf Properties, Inc., such as the requirement of posting a bond for design implementations which might be required by the towns.

Leibowits estimates the cost of obtaining the Nelson design and conditional site-plan approvals at more than $1.2 million.

---

**1.** Unless otherwise indicated, the recitation of facts herein is drawn from the Movant's Motion for Summary Judgment and Statement Pursuant to Local Rule 7056–1 and the Trustee's "Affirmation in Opposition" to the Motion for Summary Judgment and Opposing Statement Pursuant to Local Rule 7056–1.

**2.** Of these 457 acres, approximately 277 acres was owned by Duke & Benedict, Inc., and the remainder belonged to Benedict Dairy Farms.

### The 1996 Modification Agreement, Overconveyance Agreement and Sale

Unfortunately, D & B was unable to perform its end of the 1994 Agreement—it could not convey clear title. As the Trustee states at paragraph 42 of his Opposing Statement Pursuant to Rule 7056-1:

42. After the 1994 Agreement was signed, D & B's financial condition, already unsolvent [sic], further deteriorated. Barnett Bank had commenced a foreclosure proceeding against D & B's major real estate project and major asset, a development in Florida known as University Commons. In addition, Putnam County was threatening to take the Property because of [D & B's] failure to pay real estate taxes. D & B was in default under a mortgage encumbering the Property, which was held by Summit Bank. TSNY Realty Corp., which also held a mortgage on the Property, had commenced a foreclosure proceeding. C & C Realty Associates had filed a lis pendens against the Property. All of D & B's real property was encumbered, and D & B had no reliable source of income and no ability to borrow funds. Leibowits knew about these liens, foreclosure proceedings, encumbrances and the real estate tax arrearages.

By April 1996, Leibowits had obtained virtually all of the required approvals and was ready to effectuate the closing contemplated in the 1994 Agreement. However, D & B's financial paralysis would have prevented it from meeting its obligation to convey clear title to the Golf Course Land under the 1994 Agreement. Fearing that the site-plan approval would lapse if the conditions were not fulfilled in a timely manner, Leibowits sued D & B in New York State Supreme Court in April 1996 to compel D & B to contribute legal title to the Golf Course Land free and clear of all encumbrances.

On September 13, 1996, D & B and Leibowits entered into a "Modification Agreement" by which Leibowits agreed to drop its state court suit, and D & B agreed to transfer legal title to the Property—including the Golf Course Land—to Leibowits.[3] The Modification Agreement provided immediate funding to D & B so that it could fulfill its obligation under the 1994 Agreement.

The Modification Agreement not only modified but superseded the 1994 Agreement and changed the basic character of the transaction between the parties from a joint venture to an outright sale of the Golf Course Land by D & B to Leibowits. The Modification Agreement recited that "[t]he parties no longer intend to form a limited liability company and all provisions in the contract relating thereto shall have no further force and effect." The Property, including the Golf Course Land, was sold to Leibowits for $2,250,000, but Leibowits agreed to reconvey the Excess Acreage to D & B "in accordance with a separate letter agreement," which the parties refer to as the "Overconveyance Agreement".

In the Overconveyance Agreement, also dated September 13, 1996, D & B conveyed the Excess Acreage to Leibowits. The parties intended the conveyance to be a "nominal transfer to [Leibowits] only and [D & B] shall retain full beneficial ownership of the Excess Acreage". The Overconveyance Agreement provided for an immediate 99-year, renewable, rent-free leaseback to D & B. The purpose of the Overconveyance Agreement was to facilitate transfer of development rights from the

---

**3.** At the direction of Peter D. Leibowits Company, Inc., D & B conveyed title to Centennial Golf Club of New York, LLC.

Golf Course Land to the Excess Acreage. The Excess Acreage would then be reconveyed to D & B.

Summarizing the Modification Agreement and Overconveyance Agreement, D & B received $2,250,000 for the conveyance of the Property and the relinquishment of a right to a 25–percent share in the LLC. In addition, Leibowits agreed to pay a broker's commission of approximately $180,000, and D & B agreed to pay unpaid real-estate taxes of approximately $100,000. D & B retained beneficial ownership of the Excess Acreage and conveyed that land to Leibowits for the sole purpose of acquiring, to the extent possible, development rights for the Excess Acreage from the Golf Course Land.

The essence of the dispute in this adversary proceeding is over the sufficiency of the price paid by Leibowits to D & B for the Golf Course Land (the "1996 Sale").[4]

*Appraisals of the Golf Course Land*

The Trustee submitted an appraisal by Eugene Albert which estimated the gross value of the Property as of September 13, 1996 to be "at least $6,370,000, discounted to $5,450,000." (Affidavit of Eugene Albert, ¶ 10). Albert appraised the Golf Course Land, with the site-plan approvals and the Larry Nelson design, at a value of "at least $5,500,000, before any discount for lack of final subdivision approval or for bulk purchase." (Id.)

Edward R. Heelan, president of a real-estate brokerage and development company located in Putnam County, estimated

the value of the Property at "approximately $8,000,000 to $9,000,000" on September 13, 1996. (Affidavit of Edward Heelan, ¶ 13). Heelan reached this total because he estimated that at least 200 residential units could have been built on the Property as of right under the existing zoning, for a value of $5,000,000 to $6,000,000, and that the remaining land, enough to build a 27–hole golf course, had a value of $3,000,000. (Id.) Heelan's estimate did not consider the value of the site-plan approvals or Larry Nelson design; instead, it estimated the value of the property required to build a hypothetical 27–hole golf course.

The appraisal by Edward Ferrarone, which was submitted by Leibowits evaluates the Property as "Vacant Land, Now Developed as Centennial Golf Course". Ferrarone's appraisal stated that the Excess Acreage "essentially had no value" as to Leibowits. The Ferrarone appraisal states:

> The purpose of this appraisal is to estimate the Market Value of the Fee Simple Estate to a buyer. At the time of the sale, September 13, 1996, the Centennial Development plan was nearly approved for development with a 27–hole public golf course. *The approvals were obtained solely by the buyer, at the buyer's expense.* The agreement to purchase the land was based on its condition and status at the time of contract as vacant land, without special approvals of any kind. The approved site plan was specific to the developer, Centennial

---

4. There parties are in disagreement as to whether, in addition to the $2,250,000 paid in cash for the Golf Course Land, additional value should be attributed to D & B or Leibowits for their respective undertakings to pay unpaid real-estate taxes and broker commission. Leibowits estimates the total consideration paid to be at least $2,430,000 and D & B estimates the total consideration to be

no more than $2,230,000. Under the analysis which follows, whatever the actual consideration paid, be it $2,230,000 or $2,430,000, would be reasonably equivalent to D & B's interest in the Golf Course Land at the time of the 1996 Sale. Therefore, the disagreement as to this additional consideration is not a material fact for the purposes of this summary judgment motion.

Golf Properties, and to the plan which was completed by the architect, Larry Nelson. *The site plan and approvals were not the property of [D & B].* (emphasis in original). Based on these assumptions, Ferrarone estimated the value of the Property on September 13, 1996 to be $2,100,000.

### Bankruptcy Proceedings

On January 24, 1997, D & B filed a Chapter 11 bankruptcy petition. The Trustee brought a fraudulent conveyance action under 11 U.S.C. § 548 and § 550 to recover the full value of the Golf Course Land as estimated by Albert and, indirectly, by Heelan. The Trustee alleges that the 1996 Sale was made with "actual intent to hinder, delay, or defraud" D & B's creditors under Section 548(a)(1)(A), and was constructively fraudulent under Section 548(a)(1)(B). The Trustee also asserts causes of action for actual and constructive fraud under the New York Debtor & Creditor Law (D & CL) §§ 273, 274, 275 and 276.[5]

### The Standard for Summary Judgment

Federal Rule of Civil Procedure 56(c), made applicable to this adversary proceeding by Fed. R. Bankr.P. 7056, governs summary judgment motions. Initially, the moving party must show that no genuine material issues of fact exist, and that he is entitled to judgment as a matter of law. *Accord Cargill, Inc. v. Charles Kowsky Resources, Inc.,* 949 F.2d 51, 55 (2d Cir. 1991). A court cannot decide disputed issues of fact, but instead, must assess whether any factual issues exist, and resolve any ambiguities or inferences against the moving party. *Lopez v. S.B. Thomas,*

*Inc.,* 831 F.2d 1184, 1187 (2d Cir.1987); *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

If the movant carries this initial burden, the nonmoving party must set forth specific facts that show triable issues, and cannot rely on pleadings containing mere allegations or denials. Fed.R.Civ.P. 56(e). *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party must show that there is more than a metaphysical doubt regarding a material fact, *Matsushita Elec. v. Zenith,* 475 U.S. at 586; *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 146 (2d Cir.1993), and may not rely solely on self-serving conclusory statements. *Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993); *Wyler v. U.S.,* 725 F.2d 156, 160 (2d Cir.1983).

At oral argument, the parties agreed that no triable factual issue exists, and that the only relevant dispute between the parties is which valuation should be accepted for the purposes of assessing whether D & B received "reasonably equivalent value" in return for the September 13, 1996 conveyance of the Property to Leibowits. (Transcript 28)

### Discussion

Under both Section 548(a)(1)(B) and the D & CL, a trustee must prove that a "transfer of an interest of the debtor" occurred at a time when the debtor was insolvent, and that the debtor received less

---

**5.** The Trustee also asserts claims for breach of fiduciary duty, constructive trust, the right to an accounting, and for a declaratory judgment. However, those claims are being dealt with in Adversary Proceeding 99–2263. That action is not subject to this motion for summary judgment.

than "fair consideration" or "reasonably equivalent value" from the transfer.[6]

The parties agree that D & B was insolvent as early as 1991. Thus, the only issue is whether D & B received "fair consideration" or "reasonably equivalent value" in the 1996 Sale.[7]

▮▮▮ Reasonably equivalent value is present if the debtor receives a fair equivalent in exchange for its property or obligation. *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 638 (2d Cir.1995). Defined quantitatively, the debtor should receive "a fair equivalent" or an "amount not disproportionately small" as compared with the value of the property or obligation the debtor has given up. *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979,

6.  Section 548(a)(1)(B) states:

    (a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

    *    *    *    *    *    *

    (B)(1) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

    (ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

    (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

    (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

    The parallel provisions are found in four sections of the D & CL:

    **§ 272.  Fair Consideration**

    Fair consideration is given for property, or obligation,

    a.  When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

    b.  When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

    **§ 273.  Conveyances by insolvent**

    Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

    **§ 274.  Conveyances by persons in business**

    Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.

    **§ 275.  Conveyances by a person about to incur debts**

    Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.

7.  Because the D & CL parallels Section 548, the two statutes are interpreted similarly by the courts. *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 638 (2d Cir.1995); *SIPC v. Ensminger (In re Adler, Coleman Clearing Corp.)*, 247 B.R. 51, 116 (Bankr.S.D.N.Y.1999); *European American Bank v. Sackman Mortgage Corp. (In re Sackman Mortgage Corp.)*, 158 B.R. 926, 938 (Bankr.S.D.N.Y.1993); *Scherling v. Pan Trading Corp., S.A. (In re Chadborne Industries, Ltd.)*, 71 B.R. 86, 89 (Bankr. S.D.N.Y.1987); *Murdock v. Plymouth Enterprises, Inc. (In re Curtina Int'l, Inc.)*, 23 B.R. 969, 974 (Bankr.S.D.N.Y.1982); *Pereira v. Checkmate Communications Co. (In re Checkmate Stereo & Electronics)*, 9 B.R. 585, 591 (Bankr.E.D.N.Y.1981), *aff'd*, 21 B.R. 402 (E.D.N.Y.1982); *In re The Bennett Funding Group, Inc.*, 220 B.R. 743, 754 (Bankr. N.D.N.Y.1997).

993 (2d Cir.1981); *In re 375 Park Avenue Associates, Inc.,* 182 B.R. 690, 695–696 (Bankr.S.D.N.Y.1995); *Coan v. Fleet Credit Card Services (In re Guerrera),* 225 B.R. 32, 35–36 (Bankr.D.Conn.1998). "The determination of whether reasonably equivalent value was received by the debtor requires the court to compare what was given with what was received." *In re Guerrera,* 225 B.R. at 36. This standard has been described as a "measurement test." *Yoder v. T.E.L. Leasing, Inc. (In re Suburban Motor Freight, Inc.),* 124 B.R. 984, 997 (Bankr.S.D.Ohio 1990).

■ The court may only avoid a "transfer of an interest of the debtor." *See, e.g., Gaudet v. Babin (In re Zedda),* 103 F.3d 1195, 1204 (5th Cir.1997). Therefore, before applying the measuring test to see if the debtor received reasonably equivalent value, a court must determine the "interest of the debtor" that was transferred. In other words, the measuring test does not examine the value of the property that was conveyed, but the value of the *debtor's interest* in the property conveyed.

■ It is not disputed that D & B conveyed the Golf Course Land to Leibowits for $2,250,000. However, the parties disagree as to the extent D & B had rights in the Golf Course Land. This dispute is reflected in the three estimates submitted by the parties. Those estimates do not necessarily conflict with one another as to the value of the Golf Course Land; rather, they begin the evaluation of what was conveyed by D & B in the 1996 Sale from different premises. The Albert estimate values the Property as a whole, and the Golf Course Land with site-plan approvals and the Larry Nelson design. Heelan estimates the value of the Property if 200 residential units had been constructed and the remaining land had been used to construct a comparable golf course. The Fer-

rarone appraisal values only the Golf Course Land minus the site-plan approvals and Larry Nelson design.

Thus, the crucial disagreement is not over the value of the Golf Course Land, but over the nature and extent of the interest conveyed by D & B in the 1996 Sale. Both parties fail to properly assess the interest transferred by D & B in the 1996 Sale.

The Trustee argues that the Debtor was entitled to the full value of the Golf Course Land at the time of the 1996 Sale, as improved by the Larry Nelson design and the site-plan approvals. In the Trustee's view the Modification Agreement nullified the 1994 Agreement. Thus, the Trustee contends that the lack of reasonably equivalent value is clear on the face of the 1996 Sale: the Golf Course Land was worth at least $5,450,000 and D & B received only $2,250,000. The Trustee's theory is flawed because it assesses the full value of the property transferred, rather than D & B's interest in the property. To be correct, the Trustee would have to show that D & B had an unimpaired right to the full, improved value of the Golf Course Land at the time of the 1996 Sale. Yet the Trustee does not dispute that the 1994 Agreement was a valid, enforceable contract until superseded by the Modification Agreement. Obviously, D & B could not have sold the Property or Golf Course Land, as improved by the Larry Nelson design and site-plan approvals, in the open market because D & B was obligated to convey the Golf Course Land to an LLC under the 1994 Agreement.

Leibowits argues that the Trustee improperly seeks entitlement to improvements which were created exclusively by Leibowits. As Leibowits sees it, D & B was entitled to no more than the value of the "raw land," which Leibowits' appraiser valued at $2,100,000. Leibowits expended

the efforts and funds needed to enhance the value of the Property. Leibowits posits that D & B had no interest in the value attributable to the Nelson design or the site-plan approvals because Leibowits alone held the proprietary rights to the Larry Nelson design and the site-plan approvals. The flaw in Leibowits' argument is its failure to allocate value to D & B for anything other than the raw land D & B owned prior to the 1994 Agreement. While acknowledging its own rights under the 1994 Agreement, Leibowits seeks to strip D & B of any benefit under the same agreement. Leibowits claims absolute ownership of the site-plan approvals and Nelson design, but those items were obtained in furtherance of a joint venture with D & B and not for a proprietary purpose exclusive to Leibowits.

To determine what interest was transferred by D & B in the 1996 Sale, D & B's rights and obligations as they existed immediately before the transaction must be ascertained. Those rights are determined by reference to the 1994 Agreement, which both parties agree was valid and enforceable until the Modification Agreement was made. Under the 1994 Agreement, D & B was obligated to contribute the Golf Course Land to an LLC if Leibowits timely obtained the site-plan approvals. When Leibowits obtained the necessary requirements in March 1996, D & B became contractually obligated to convey the Golf Course Land in return for 25 percent of the LLC. Thus, immediately before the 1996 Sale, D & B had the right to a 25 percent interest in the Golf Course Land as improved by the Larry Nelson design and the site-plan approvals. This was the "interest of the debtor" which D & B transferred in the 1996 Sale.

■ The Trustee agreed at oral argument that the $2,250,000 received by D & B in the 1996 Sale was at least 25 percent of the enhanced value of the Golf Course Land:

> THE COURT: Were you paid at least 25 percent of the value of the improved real estate? I take it that you were—at least 25 percent.
>
> MR. KITTAY: Yes.
>
> THE COURT: What did you pay? A lot more than 25 percent?
>
> MR. KITTAY: Well, Mr. Heelan says it's worth between $8 million and $9 million. That would be about 25 percent and Mr. Albert says it's worth about $5.5 million. That certainly would be close to 50 percent.

(Transcript 45) This is determinative because the focus of the reasonably equivalent value analysis is the value of the property at the time of the transaction. *Breeden v. L.I. Bridge Fund, LLC (In re Bennett Funding Group, Inc.)*, 232 B.R. 565, 570 (Bankr.N.D.N.Y.1999); *Butler Aviation Intl., Inc. v. Whyte (In re Fairchild Aircraft Corp.)*, 6 F.3d 1119, 1127 (5th Cir.1993); *Cooper v. Ashley Communications, Inc., (In re Morris Communications)*, 914 F.2d 458, 466 (4th Cir.1990); 5 L. King, COLLIER ON BANKRUPTCY ¶ 548.05[1][b] at 548–38 (15th Ed.1998) ("The critical time is when the transfer is 'made.' Neither subsequent depreciation nor appreciation in the value of the consideration affects the question of whether reasonably equivalent value was given.") Therefore, in the 1996 Sale D & B received at least 25 percent of the value of the Golf Course Land under each of the three estimates submitted by the parties. This was at least equivalent to what D & B would have been entitled to receive immediately prior to the 1996 Sale. Accordingly, D & B received reasonably equivalent value in the 1996 Sale.

### Conclusion

Counsel for defendants Peter D. Leibowits Company, Inc. and Centennial Golf Club of New York, LLC is requested to prepare and circulate a proposed order consistent with this decision granting summary judgment to the moving defendants.